101

Zev Shechtman (Bar No. 266280)
*zev.shechtman@saul.com*
Steven F. Werth (Bar No. 205434)
*steven.werth@saul.com*
Jeffrey Hampton (admitted pro hac vice)
*jeffrey.hampton@saul.com*
Turner N. Falk (admitted pro hac vice)
*turner.falk@saul.com*

Attorneys for Hronis, Inc. and
affiliated Debtors and Debtors in Possession

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# UNITED STATES BANKRUPTCY COURT

# EASTERN DISTRICT OF CALIFORNIA

# FRESNO DIVISION

| | |
|---|---|
| In re: | Case No. 1:26-bk-10978 |
| HRONIS, INC., a California corporation, et al., | Chapter 11 |
| | DC No.: SE-9 |
| Debtors in Possession | (Jointly Administered with Case Nos. 1:26-bk-10979, 1:26-bk-10980, 1:26-bk-10981, 1:26-bk-10982, 1:26-bk-10983, 1:26-bk-10984, 1:26-bk-10986, 1:26-bk-10987, and 1:26-bk-10988) |

Affects:

☒ ALL DEBTORS

☐ HRONIS, INC., a California corporation

☐ HRONIS CAPITAL ASSETS, LP, a California limited partnership

☐ HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company

☐ HRONIS CITRUS, LLC, a California limited liability company

☐ HRONIS FARMING, LP, a California limited partnership

☐ HRONIS FRUIT COMPANY LLC, a California limited liability company

☐ HRONIS LAND COMPANY, a California general partnership

☐ HRONIS RANCH, LLC, a California

**EXHIBITS IN SUPPORT OF FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION OPERATIONAL CASH FLOW FINANCING AND (B) USE CASH COLLATERAL; (II) GRANTING (A) LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE CLAIMS AND (B) ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

Date:     April 7, 2026
Time:     9:30 a.m. PT

| | | | |
|---|---|---|---|
| limited liability company | Place: | U.S. Bankruptcy Court | |
| ☐ HRONIS RESOURCE MANAGEMENT, LLC, a California limited liability company | | 2500 Tulare Street Fresno, CA 93721 Courtroom 13 (5th Floor) | |
| ☐ THE HRONIS FAMILY LIMITED PARTNERSHIP, a California limited partnership | Judge: | Hon. René Lastreto II | |

Hronis, Inc., a California corporation, the debtor in possession in the above-captioned case ("Hronis, Inc."), and its affiliated debtors in possession (collectively with Hronis, Inc., the "Debtors"), submit the following exhibits, which are the exhibits to the Debtors' *Final Order (i) Authorizing the Debtors to (a) Obtain Postpetition Operational Cash Flow Financing and (b) Use Cash Collateral; (ii) Granting (a) Liens and Providing Superpriority Administrative Claims and (b) Adequate Protection to Prepetition Secured Parties; (iii) Modifying the Automatic Stay; (iv) Scheduling a Final DIP Hearing; and (v) Granting Related Relief.*

| Exhibit | Description | Pages |
|---|---|---|
| 1 | Debtor-in-Possession Loan Agreement | 3-98 |
| 2 | Budget | 99-101 |

DATED: April 24, 2026        SAUL EWING LLP

By:       /s/ Zev Shechtman
       ZEV SHECHTMAN
       Attorneys for Hronis, Inc. and affiliated Debtors
       and Debtors in Possession

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

2

# EXHIBIT 1

**Secured Superpriority Debtor-in-Possession Loan Agreement**

between

**Conterra Agricultural Capital, LLC**

and

**Hronis Capital Assets, LP**

**Hronis Capital Management, LLC**

**Hronis Citrus, LLC**

**Hronis Farming, LP**

**Hronis Fruit Company LLC**

**Hronis, Inc.**

**Hronis Land Company**

**Hronis Ranch, LLC**

**Hronis Resource Management, LLC**

**The Hronis Family Limited Partnership**

dated as of

March **[__]**, 2026

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS AND INTERPRETATION ..................................................4
    Section 1.01 Definitions ...........................................................................4
    Section 1.02 Interpretation.....................................................................16
ARTICLE II THE COMMITMENT AND LOANS ....................................................17
    Section 2.01 The DIP Facility .................................................................17
    Section 2.02 Procedures for Borrowing ..................................................17
    Section 2.03 Mandatory Prepayments ...................................................18
    Section 2.04 Interest..............................................................................19
    Section 2.05 Computation of Interest ....................................................19
ARTICLE III CONDITIONS PRECEDENT .............................................................19
    Section 3.01 Conditions Precedent to Effectiveness of Agreement and Initial Advance ....19
    Section 4.02 Conditions Precedent to Each Loan ...................................20
ARTICLE IV PRIORITY AND LIENS ....................................................................22
    Section 4.01 Status of Obligations; Perfection and Priority of Security Interests ..............22
    Section 4.02 Carve-Out .........................................................................23
ARTICLE V REPRESENTATIONS AND WARRANTIES ........................................23
    Section 5.01 Power; Authorization; Enforceability...................................23
    Section 5.02 No Contravention...............................................................23
    5.03 Perfected Security Interest .............................................................24
ARTICLE VI AFFIRMATIVE COVENANTS ...........................................................24
    6.01 Budget...........................................................................................24
    Section 6.02 Conference Call .................................................................25
    Section 6.02 Other Information ...............................................................25
    Section 6.04 Chapter 11 Plan Milestones. .............................................26
    Section 6.05 Maintenance of Insurance .................................................27
    Section 6.06 Inspection of Property; Books and Records; Discussions ...............27
    Section 6.07 Use of Proceeds ...............................................................27
    Section 6.08 Compliance DIP Financing Orders and Approved Budget ...........28
    Section 6.09 Waiver of Certain Claims...................................................28
    Section 6.10 Material Actions in the Bankruptcy Case ...........................29
    Section 6.11 Further Assurances ...........................................................29
ARTICLE VII NEGATIVE COVENANTS.................................................................30
    Section 7.01 Limitation on Debt .............................................................30
    Section 7.02 Limitation on Liens.............................................................30
    Section 7.03 Mergers; Nature of Business; Organizational Documents ...........31
    Section 7.04 Limitation on Investments and New Accounts ....................32
    Section 7.05 Limitation on Dispositions .................................................32
    Section 7.06 Additional Bankruptcy Matters...........................................32
ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES........................................33
    Section 8.01 Events of Default...............................................................33
    Section 8.02 Remedies Upon Event of Default.......................................36
ARTICLE IX MISCELLANEOUS...........................................................................37
    Section 9.01 Notices .............................................................................37
    Section 9.02 Amendments and Waivers.................................................38
    Section 9.03 Expenses; Damage Waiver ...............................................39

2

4928-9616-7304.9

Section 9.04 Successors and Assigns ...................................................................40
Section 9.05 Survival ..........................................................................................40
Section 9.06 Counterparts; Integration; Effectiveness.......................................41
Section 9.07 Severability.....................................................................................41
Section 9.08 Right of Setoff ...............................................................................42
Section 9.09 Governing Law; Jurisdiction; Consent to Service of Process .........42
Section 9.10 New Value ......................................................................................43
Section 9.11 Waiver of Jury Trial .......................................................................43
Section 9.12 No Fiduciary Duties .......................................................................44
Section 9.13 Payment of Expenses ....................................................................44
Section 9.14 Indemnification .............................................................................45
Section 9.15 Headings........................................................................................45

4928-9616-7304.9

**SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT**

This Secured Superpriority Debtor-in-Possession Loan Agreement (this "**Agreement**"), dated as of March **[__]**, 2026, is entered into between Hronis Capital Assets, LP, a California limited partnership ("**Hronis Capital Assets**"), Hronis Capital Management, LLC, a California limited liability company ("**Hronis Capital Management**"), Hronis Citrus, LLC, a California limited liability company ("**Hronis Citrus**"), Hronis Farming, LP, a California limited partnership ("**Hronis Farming**"), Hronis Fruit Company LLC, a California limited liability company ("**Hronis Fruit Company**"), Hronis, Inc., a California corporation ("**Hronis, Inc.**"), Hronis Land Company, a California partnership ("**Hronis Land Company**"), Hronis Ranch, LLC, a California limited liability company ("**Hronis Ranch**"), Hronis Resource Management, LLC, a California limited liability company ("**Hronis Resource Management**"), The Hronis Family Limited Partnership, a California limited partnership ("**The Hronis Family Limited Partnership**" and, together with Hronis Capital Assets, Hronis Capital Management, Hronis Citrus, Hronis Farming, Hronis Fruit Company, Hronis, Inc., Hronis Land Company, Hronis Ranch, and Hronis Resource Management, each a "**Debtor**" and, collectively, the "**Debtors**"), and Conterra Agricultural Capital, LLC, a Delaware limited liability company ("**Lender**").

**RECITALS**

A.        On March 6, 2026, Debtors commenced bankruptcy cases being jointly administered under the case caption In re Hronis, Inc., Case No. _____ (each, a "*Case*" and collectively, the "**Cases**") by filing voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Eastern District of California.

B.        Debtors have requested that Lender provide a delayed draw debtor-in-possession financing facility that is senior secured, super-priority as to Debtors in the maximum amount of up to $22,303,000 (the "**DIP Facility**"), to fund the working capital requirements of Debtors, including certain costs associated with the Cases, and Lender is willing to provide such DIP Facility on the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**AGREEMENT**

**ARTICLE I**
**DEFINITIONS AND INTERPRETATION**

**Section 1.01        Definitions.** As used in this Agreement, the following terms shall have the meanings set forth below:

"**Actual Disbursement Variance**" has the meaning provided in Section 6.01(c).

"**Adequate Protection Liens**" has the meaning provided in Section 7.02(b).

4

4928-9616-7304.9

"**Administrative Expenses**" means (i) the allowed fees and expenses of the clerk of the Bankruptcy Court and of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b), and (ii) the allowed fees and expenses payable under Sections 330 and 331 of the Bankruptcy Code to the Debtor Professionals and the Committee Professionals; except that, unless otherwise provided in the Final DIP Financing Order, "Administrative Expenses" shall not include any fees or expenses incurred, directly or indirectly, in respect of, arising from or relating to (a) the initiation or prosecution of any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims or causes of action against Lender or with respect to this Agreement or any of the other Loan Documents, the DIP Obligations, or the Prepetition Obligations, (b) hindering, delaying or otherwise attempting to prevent the enforcement by Lender of its Liens or realization upon any Collateral, or (c) arising after the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code.

"**AgAmerica**" means AgAmerica Lending, LLC, a Florida limited liability company.

"**AgAmerica Borrowers**" means Hronis Ranch, The Hronis Family Limited Partnership, Hronis Land Company, Hronis Citrus, Hronis Capital Assets, Peter John Hronis, and Kosta James Hronis.

"**AG REIT**" means AG REIT TWO, LLC, a Florida limited liability company.

"**Agreement**" has the meaning provided in the recitals hereto.

"**Affiliate**" as to any Person, means any other Person that, directly or indirectly through one or more intermediaries, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"**Allowed Professional Fees**" means any attorney fees and expenses of the Debtor Professionals or the Committee Professionals, as the case may be, allowed by the Bankruptcy Court, whether by interim order, procedural order, or otherwise.

"**Approved Budget**" has the meaning provided in Section 6.01(a).

"**Availability Period**" means the period from and including the Effective Date to the Maturity Date.

"**Available Credit**" means, at any time, an amount equal to the difference between the Maximum Available Credit and the aggregate principal amount of the Loans advanced under the DIP Facility.

"**Avoidance Actions**" means claims and Causes of Action of Debtors or their estates under Chapter 5 of the Bankruptcy Code and the proceeds of any claims and Causes of Action under chapter 5 of the Bankruptcy Code of Debtors or their estates.

"**Bankruptcy Code**" has the meaning provided in the recitals hereto.

5

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of California or any other court having jurisdiction over any Case from time to time, including any judge presiding over any Case.

"**Borrowing Date**" means any Business Day specified by Lead Debtor in a Borrowing Notice as a date on which Lead Debtor requests Lender to make a Loan hereunder.

"**Borrowing Notice**" with respect to any request for a borrowing of Loans hereunder, means a notice from Lead Debtor requesting a Loan.

"**Business Day**" means a day other than a Saturday, Sunday, or other day on which commercial banks in San Francisco, California or New York, New York, are authorized or required by law to close.

"**Carve-Out**" means proceeds of any Collateral used to pay only: (i) unpaid fees and expenses required to be paid by Debtors to the clerk of the Court or to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (ii) reasonable fees and expenses incurred by a trustee in any Successor Case under section 726(b) of the Bankruptcy Code in an aggregate cumulative amount not to exceed $100,000; (iii) to the extent allowed by the Bankruptcy Court at any time before the first Business Day following delivery by Lender of a Carve-Out Trigger Notice, all Allowed Professional Fees of the Debtor Professionals and the Committee Professionals provided for in the Approved Budget; and (iv) Allowed Professional Fees of the Debtor Professionals and the Committee Professionals in an aggregate amount not to exceed the Post-Carve-Out Trigger Notice Cap.

"**Carve-Out Reserve Account**" means a segregated designated professional fee account maintained by Saul Ewing LLP, which shall be used solely to escrow funds for the payment of Allowed Professional Fees of the Debtor Professionals and Committee Professionals included in the Carve-Out.

"**Carve-Out Trigger Notice**" means a written notice by Lender to the Debtors, their lead restructuring counsel, the Committee and its lead counsel, and the U.S. Trustee, which notice may be delivered following the Maturity Date or the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

"**Case**" and "**Cases**" has the meaning given to such term in the Recitals.

"**Cash Collateral**" has the meaning provided in Section 363(a) of the Bankruptcy Code.

"**Cash Equivalents**" as to any Person, means (a) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person, (b) time deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any State thereof or, the District of Columbia, having capital, surplus, and undivided profits aggregating in excess of $500,000,000, having maturities of not more than

6

4928-9616-7304.9

one year from the date of acquisition by such Person, (c) repurchase obligations with a term of not more than 90 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, (d) commercial paper issued by any issuer rated at least A-1 by S&P or at least P-1 by Moody's (or carrying an equivalent rating by a nationally recognized rating agency if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally), and in each case maturing not more than one year after the date of acquisition by such Person, or (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above.

"**Cash Management Order**" means the Bankruptcy Court order, in form and substance reasonably satisfactory to Lender, relating to Debtors' cash management system and bank accounts.

"**Causes of Action**" means any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Effective Date, in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non U.S. law; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of title 11 of the United States Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, and (f) any "Lender liability" or equitable subordination claims or defenses.

"**Change of Control**" means any Person or group of persons within the meaning of § 13(d)(3) of the Securities Exchange Act of 1934 becomes the beneficial owner, directly or indirectly, of 35% or more of the outstanding Equity Interests of any Debtor.

"**Collateral**" means (a) the Personal Property Collateral, (b) the Real Property Collateral, (c) (only upon entry of the Final DIP Financing Order) Avoidance Actions, and (d) collectively, to the extent not included in the foregoing, all real, personal, and mixed property (including equity interests) of Debtors' estates in the Cases, including, without limitation, all inventory, accounts, investment property, general intangibles, contracts, documents, letter-of-credit rights, commercial tort claims, chattel paper, owned real estate, real property leaseholds, licenses and permits, fixtures, equipment, deposit accounts, money, patents, copyrights, trademarks, trade names, rights under license agreements and

7

4928-9616-7304.9

other intellectual property, including, without limitation, the products and proceeds thereof.

"**Collateral Documents**" means this Agreement, the DIP Orders, and any other documents and instruments constituting or granting Lender a Lien on Collateral.

"**Committee**" means any official unsecured creditors' committee appointed by the Bankruptcy Court

"**Committee Professionals**" means persons or firms retained by any official unsecured creditors' committee appointed by the Bankruptcy Court pursuant to section 327, 328, or 363 of the Bankruptcy Code.

"**Contractual Obligation**" of any Person, means any provision of any security issued by such Person or of any agreement, instrument, or other undertaking to which such Person is a party or by which it or any of its property is bound, other than the DIP Obligations and Prepetition Obligations.

"**CRO**" means Scott Avila and Allen Soong of Paladin Management Group, LLC.

"**Debt**" of any Person at any date, without duplication, means (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables and accrued expenses incurred in the ordinary course of business), (c) all obligations of such Person evidenced by notes, bonds, debentures, or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person to purchase, redeem, retire, defease, or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights, or options to acquire such Equity Interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit, or similar facilities in respect of obligations of the kind referred to in subsections (a) through (e) of this definition, (g) any guaranty by such Person in respect of obligations of the kind referred to in subsections (a) through (f) above, and (h) all obligations of the kind referred to in subsections (a) through (g) above secured by (or which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation.

"**Debtor Professionals**" means persons or firms retained by Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code.

"**Debtor**" and "**Debtors**" has the meaning given to such term in the recitals hereto.

8

"**Default**" means any of the events specified in Section 8.01 which constitutes an Event of Default or which, upon the giving of notice, the lapse of time, or both pursuant to Section 8.01 would, unless cured or waived, become an Event of Default.

"**DIP Facility**" has the meaning provided in the recitals hereto.

"**DIP Financing Orders**" means the Interim DIP Financing Order and the Final DIP Financing Order.

"**DIP Obligations**" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, covenants, and indemnities of, Debtors arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect, absolute, or contingent, due or to become due, now existing or hereafter arising.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease, or other disposition (whether in one transaction or in a series of transactions, and including any sale and leaseback transaction) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer, or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Dollars**" or "**$**" means the lawful currency of the United States.

"**Effective Date**" means the date on which each of the conditions precedent set forth in Section 3.01 are satisfied.

"**Eligible Assignee**" has the meaning provided in Section 9.04(b).

"**Equity Interests**" means with respect to any Person any and all shares, interests, participations, or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership (or profit) interests in a Person (other than a corporation), securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person, and any and all warrants, rights, or options to purchase any of the foregoing, whether voting or nonvoting, and whether or not such shares, warrants, options, rights, or other interests are authorized or otherwise existing on any date of determination.

"**Event of Default**" has the meaning set forth in Section 8.01.

"**Final DIP Financing Order**" means a Final Order entered or approved by the Bankruptcy Court authorizing the DIP Facility in substantially the form of the Interim DIP Financing Order, with only such modifications in form and substance that are satisfactory to Lender and Debtors (as the same may be amended, supplemented, or modified from time to time after entry thereof with the written consent of Lender, in Lender's sole discretion). Without limiting the foregoing, the Final DIP Financing Order must (a) provide that Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, the "equities of the case" exception under sections 552(b)(i) and (ii) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, rents, issues or profits of any of their collateral, and no expenses of administration of the Case or any future

9

proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under section 552(b) of the Bankruptcy Code, (b) include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by Lender, (c) provide that Lender shall have the right to serve as the stalking horse bidder in connection with any sale or disposition of assets by Debtors in any Case and to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the DIP Obligations and the Prepetition Obligations, in whole or in part, in connection with any sale or disposition of assets by Debtors in any Case and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code, and (d) provide that Lender may exercise all remedies available under this Agreement and the Loan Documents, as applicable, without any requirement first to look to exercise any of its or their rights against any particular collateral or party or to exhaust any remedies available to it or them against any particular collateral or party or to resort to any other source or means of obtaining payment of any of such obligations or to elect any other remedy. Subject to entry of the Final DIP Financing Order, in no event shall Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

"**Final DIP Financing Order Deadline**" has the meaning provided in Section 6.04(b).

"**Final Order**" means an order or judgment of the Bankruptcy Court as entered on its docket that has not, in whole or in part, been reversed, vacated, modified, amended or stayed pursuant to any applicable bankruptcy law or any other applicable rule of civil or appellate procedure, and as to which the time to appeal, petition for certiorari or seek re-argument or rehearing has expired, or as to which any right to appeal, petition for certiorari or seek re-argument or rehearing has been waived in writing in a manner satisfactory to the parties in interest, or if a notice of appeal, petition for certiorari or motion for reargument or rehearing was timely filed, the order or judgment has been affirmed by the highest court to which the order or judgment was appealed or from which the re-argument or rehearing was sought, or a certiorari has been denied, and the time to file any further appeal or to petition for certiorari or to seek further re-argument has expired; provided, however, that no Order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Rule 9024 of the Federal Rules of Bankruptcy Procedure may be filed with respect to such Orders as long as such motion or action has not been filed.

"**First Day Orders**" means all orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on the Petition Date or within five days of the Petition Date or based on motions filed on or about the Petition Date, which shall each be in form and substance reasonably satisfactory to Lender.

10

4928-9616-7304.9

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**Governmental Authority**" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal, or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of, or pertaining to, government.

"**Indemnified Party**" has the meaning provided in Section 9.14.

"**Independent Director**" means Matthew English, of Arch + Beam Global, Inc.

"**Interim Available Credit**" means $10,000,000.

"**Initial Advance**" means the initial Loan to be made following satisfaction of the conditions precedent in ARTICLE III and disbursed consistent with the Approved Budget.

"**Initial Budget**" means the 13-week cash flow forecast of receipts and disbursements for the period from the Effective Date setting forth projected cash flows and disbursements attached hereto as **Exhibit A**.

"**Interim DIP Financing Order**" means an interim order entered or approved by the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of Lender in its sole discretion) in the form set forth as **Exhibit B**, with changes to such form as are satisfactory to Lender, in its sole discretion, approving the Loan Documents, which Interim DIP Financing Order shall, among other things (a) have been entered on such prior notice to such parties as may be satisfactory to Lender in its sole discretion, (b) authorize the extensions of credit in respect of the DIP Facility in the amounts and on the terms set forth herein, (c) grant Lender Superpriority Claim status and other collateral and liens referred to herein and in the other Loan Documents, and (d) approve the payment by Debtors of the fees provided for herein.

"**Interim DIP Financing Order Deadline**" has the meaning provided in Section 6.04(a).

"**Investment**" has the meaning provided in Section 7.04(a).

"**Lead Debtor**" means Hronis, Inc.

"**Lender**" has the meaning provided in the preamble hereof.

"**Lender Superpriority Claim**" has the meaning provided in Section 4.01(a).

11

4928-9616-7304.9

"**Lien**" means any mortgage, pledge, hypothecation, assignment (as security), deposit arrangement, encumbrance, lien (statutory or other), charge, or other security interest, or any preference, priority, or other security agreement or preferential arrangement of any kind or nature whatsoever having substantially the same economic effect as any of the foregoing (including any conditional sale or other title retention agreement and any capital lease).

"**Loan**" means any Loan made by Lender under Section 2.01.

"**Loan Documents**" means this Agreement, the Collateral Documents, and the Orders.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, properties, liabilities (actual or contingent), operations, or condition (financial or otherwise) of Debtors, taken as a whole, (b) the validity or enforceability of any Loan Document, (c) the perfection or priority of any material Lien purported to be created by any Loan Document, (d) the priority of Lender Superpriority Claim, (e) the rights or remedies of Lender under any Loan Document, or (f) the ability of Debtors to perform any of their material obligations under any Loan Document, provided, however, that any change, circumstance, or effect that arises out of, results from or relates to the commencement or conduct of the Cases shall not be considered in determining whether a Material Adverse Effect has occurred.

"**Material Contracts**" with respect to any Person, means each contract to which such Person is a party involving aggregate consideration payable by or to such Person equal to at least $100,000 or otherwise material to the business, condition (financial or otherwise), operations, performance, properties, or prospects of such Person.

"**Maturity Date**" means the earlier of:

> (a)      July 1, 2026;

> (b)      the date of termination of the commitments under the DIP Facility and/or acceleration of any outstanding borrowings under the DIP Facility, in each case, by Lender following the occurrence of an Event of Default and upon the delivery of a Termination Notice to the Remedies Notice Parties;

> (c)      the first business day on which the Interim DIP Financing Order expires by its terms or is terminated, unless the Final DIP Financing Order has been entered and become effective prior thereto;

> (d)      the conversion of any of the Case to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing (which may be email) by Lender;

> (e)      the dismissal of any Case, unless otherwise consented to in writing (which may be e-mail) by Lender;

12

4928-9616-7304.9

(f)     the repayment in full in cash of all DIP Obligations and termination of all commitments under the DIP Facility, unless extended with the prior written consent (which may be by email) of Lender;

(g)     closing of the Sale; and

(h)     five days after entry of the Sale order, unless extended with the prior written consent of Lender (which may be by email) in its sole discretion.

"**Maximum Available Credit**" means:

(i)     The Interim Available Credit during the period commencing on the date of the Bankruptcy Court's entry of Interim DIP Financing Order but prior to the entry of the Final DIP Financing Order, to be funded in accordance with the Initial Budget; and

(j)     $22,303,000 upon entry of the Final DIP Financing Order, to be funded in accordance with the Approved Budget.

"**Lender Superiority Claim**" has the meaning provided in Section 4.01(a).

"**Moody's**" means Moody's Investors Service, Inc., and any successor thereto.

"**Orders**" means, collectively, the Interim DIP Financing Order, the Final DIP Financing Order, and the Cash Management Order.

"**Permitted Disbursement Variance**" has the meaning provided in Section 6.01(c).

"**Permitted Priority Liens**" means the Liens described on Schedule 1.01(B).

"**Person**" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

"**Personal Property Collateral**" means all of the Debtors' Accounts, Inventory, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Payment Intangibles, Commercial Tort Claims, Farm products, Water Rights, Deposit Accounts (including all deposits into the U.S. Bank National Association Bank Account in the name of Hronis, Inc., last four #1093, Commodity Accounts, Commodity Contracts, Investment Property, Instruments, Letters of Credit Rights, Documents, Chattel Paper, Electronic Chattel Paper, Tangible Chattel Paper, all accessions to, substitutions for, and all replacements, products, proceeds, and proceeds of proceeds of the foregoing (including, without limitation, proceeds of insurance policies insuring any of the foregoing and any other kind of proceeds coming from the Debtors' crops), all rights under and payments due or to become due under any federal or state laws, rules, regulations, or programs pertaining to any of the foregoing, all books and records pertaining to any of the foregoing (including, without limitation, customer lists, credit files, computer programs, printouts and other computer materials and records), and all insurance policies insuring any of the foregoing.

13

4928-9616-7304.9

"**Petition Date**" means March 6, 2026, the date on which Debtors filed petitions for relief under Chapter 11 of Title 11 of the Bankruptcy Code.

"**Prepetition Cash Collateral**" means Prepetition Collateral consisting of cash or cash proceeds of any Prepetition Collateral consisting of accounts, payment intangibles, or inventory

"**Prepetition Collateral**" means the assets of Debtors encumbered by the Prepetition Liens.

"**Prepetition Liens**" means all Liens granted by Debtors and other parties to Lender prior to the Petition Date, as more fully described in the Prepetition Loan Documents.

"**Prepetition Loan and Security Agreement**" means the Loan and Security Agreement dated October 29, 2024, between Lender, Debtors and certain guarantors party thereto, as the same may be amended, modified, restated or replaced.

"**Prepetition Loan Documents**" means the Prepetition Loan and Security Agreement, the Prepetition Term Loan Agreement, the Prepetition Notes, that certain letter agreement dated April 9, 2025, that certain letter agreement dated June 27, 2025, documents, instruments, and certificates executed or delivered in connection therewith, including, without limitation, the "Loan Documents" as defined in the Prepetition Loan and Security Agreement and the Prepetition Term Loan.

"**Prepetition Notes**" means (a) the promissory note, dated as of October 29, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date), payable by Debtors to Lender in the face principal amount of $55,000,000.00 issued in connection with the Prepetition Loan and Security Agreement, (b) the promissory notes dated December 29, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date), payable by the AgAmerica Borrowers to Lender (as successor-in-interest to AgAmerica and AG REIT) in the face principal amounts of $50,000,000 and $20,000,000, issued in connection with the Prepetition Term Loan Agreement.

"**Prepetition Obligations**" means the indebtedness owed by Debtors to Lender under the Prepetition Loan Documents.

"**Prepetition Payment**" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any trade payables or other prepetition claims against Debtors.

"**Prepetition Secured Parties**" means those parties holding valid, perfected Liens in the Collateral prior to the Petition Date.

"**Prepetition Term Loan Agreement**" means the Term Loan Agreement dated December 29, 2023, between Lender (as successor-in-interest to AgAmerica and AG REIT) and the AgAmerica Borrowers.

"**Primed Liens**" has the meaning given to such term in Section 4.01(c).

14

"**Priming Lien**" has the meaning given to such term in Section 4.01(c).

"**Post-Carve-Out Trigger Notice Cap**" means the sum of $350,000 in the aggregate incurred on or after the first Business Day following delivery by Lender of the Carve-Out Trigger Notice.

"**Proposed Budget**" means any update to the Approved Budget proposed by the Debtors to Lender for consideration as the new Approved Budget.

"**Real Property Collateral**" means the real property described on Schedule 1.01(A) to this Agreement.

"**Related Parties**" with respect to any Person, means such Person's Affiliates and the directors, officers, employees, partners, agents, trustees, administrators, managers, advisors, and representatives of it and its Affiliates.

"**Remedies Notice**" has the meaning provided in Section 8.02(a).

"**Remedies Notice Parties**" has the meaning provided in Section 8.02(a).

"**Remedies Notice Period**" has the meaning provided in Section 8.02.

"**Reporting Date**" has the meaning provided in Section 6.01(b).

"**Representatives**" means any Person or Persons designated from time to time by Lender to represent Lender with respect to the DIP Facility.

"**Requirement of Law**" as to any Person, means the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Officer**" with respect to any Person, means the chief executive officer, president, or chief financial officer of such Person, and in the case of Debtors, means solely the CRO.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Sale**" has the meaning provided in Section 6.04(c).

"**Sale Approval Deadline**" has the meaning provided in Section 6.04(e).

"**Sale Motion**" has the meaning provided in Section 6.04(c).

"**Stay Relief Hearing**" has the meaning provided in Section 8.02.

15

4928-9616-7304.9

"**Successor Case**" means, with respect to any Case, any subsequent proceedings under the Bankruptcy Code, including any proceedings under Chapter 7 of the Bankruptcy Code.

"**Termination Notice**" has the meaning provided in Section 8.02(d).

"**Testing Date**" has the meaning provided in Section 6.01(c).

"**Testing Period**" has the meaning provided in Section 6.01(c).

"**Unencumbered Property**" means, collectively, any property of Debtors' estates as of the Petition Date that, as of the Petition Date, were unencumbered (and do not become perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code), including, subject to and upon entry of the Final DIP Financing Order, the Avoidance Actions.

"**Use of  Prepetition Cash Collateral**" means, following the Petition Date, any use by Debtors of any Prepetition Cash Collateral for the payment of any debt, liability, or other obligation of any Debtor.

"**Variance Covenant**" has the meaning provided in Section 6.01(c).

"**Variance Report**" has the meaning provided in Section 6.01(b).

**Section 1.02**    **Interpretation.** With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument, or other document shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof," and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law

16

4928-9616-7304.9

or regulation as amended, modified, or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the DIP Obligations shall mean the repayment in Dollars in full in cash or immediately available funds.

(d)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP as in effect from time to time, and applied on a consistent basis in a manner consistent with that used in preparing Debtors' audited financial statements, except as otherwise specifically prescribed herein.

(e)    For all purposes under the Loan Documents, in connection with any division or plan of division under California law (or any comparable event under a different jurisdiction's laws): (i) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (ii) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its equity interests at such time.

## ARTICLE II
## THE COMMITMENT AND LOANS

Section 2.01    The DIP Facility.

(a)    Subject to the terms and conditions of this Agreement, Lender shall make Loans to Debtors in amounts such that the aggregate principal amount of all Loans does not exceed the Maximum Available Credit. Amounts repaid may not be reborrowed. The Loans shall (x) bear interest as provided in Section 2.04 and (y) be entitled to the security interests, collateral, and other rights and benefits provided pursuant to the Collateral Documents and the Orders.

(b)    Debtors shall repay all outstanding Loans on the Maturity Date.

Section 2.02    Procedures for Borrowing. Lead Debtor may request a borrowing under the DIP Facility on any Business Day during the Availability Period; provided that, Lead Debtor

17

4928-9616-7304.9

shall deliver to Lender a Borrowing Notice (which Borrowing Notice must be received by Lender no later than 10:00 P.M. Pacific time two Business Days before the requested Borrowing Date). Each borrowing of Loans under the DIP Facility shall be in an amount not less than $500,000, and not more frequently than weekly. The Borrowing Notice for the Initial Advance may be submitted prior to entry of the Interim DIP Financing Order and will be funded no later than the Business Day following entry of the Interim DIP Financing Order.

**Section 2.03    Mandatory Prepayments.**

(a)    If for any reason the aggregate principal amount of Loans at any time outstanding exceeds Maximum Available Credit, Debtors shall immediately prepay Loans in an amount equal to such excess.

(b)    Until the DIP Facility has been repaid in full, and subject to the Carve-Out, the following mandatory prepayments shall be required to be made (unless waived in the sole and exclusive discretion of Lender) to repay the Loans within three Business Days of receipt by any Debtor:

(i)    100% of any net cash proceeds in excess of $100,000 from any asset disposition  outside the ordinary course of business that are not contemplated by the Approved Budget;

(ii)    100% of any proceeds in excess of $100,000  received (A) under any insurance policy on account of the damage or destruction of any assets or property of any Debtor and (B) due to any taking or condemnation of any assets or property;

(iii)    100% of the net cash proceeds of the incurrence or issuance of any indebtedness or equity by any Debtor; provided that no Debtor shall incur or issue any additional postpetition superpriority indebtedness or Liens unless such amount shall be sufficient to prepay the DIP Facility in cash in full;

(iv)    100% of any proceeds received or any cash in excess of $100,000 received by or paid to or for the account of any Debtor not in the ordinary course of business, including but not limited to tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments (other than casualty and condemnation event proceeds); and

(v)    the proceeds of the consummation of the consummation of the Sale as follows: (A) *First*, to satisfy any costs and expenses approved by the Bankruptcy Court that are incurred or to be incurred in connection with the Sale; (B) *Second*, to the extent assets secured by Permitted Priority Liens are included in the Sale are being sold free and clear of the Permitted Priority

18

4928-9616-7304.9

Liens, to satisfy obligations secured by Permitted Priority Liens; (C) *Third*, to the unfunded portion of the Carve-Out though the closing of the Sale; (D) *Fourth*, to satisfy the DIP Obligations; (E) *Fifth*, to satisfy any obligations secured by Adequate Protection Liens in the order of their priority; (F) *Sixth*, to satisfy the Prepetition Obligations; (G) *Seventh*, to satisfy any obligations secured by other liens in the order of their priority; and (H) *Eighth*, to Debtors' estate or whomever may be entitled to any remaining proceeds.

(c)     Until the DIP Facility has been repaid in full, but subject to the Carve-Out, Debtors shall pay down the Prepetition Obligations within three Business Days of receipt by any Debtor of the Proceeds of any Prepetition Collateral consisting of Accounts, Payment Intangibles, or Inventory.

**Section 2.04     Interest.**

(a)     Each Loan shall bear interest on the outstanding principal amount thereof at a rate per annum of 12%.

(b)     If an Event of Default occurs and is continuing, all outstanding Loans shall bear interest at a rate of 18% per annum.

(c)     Interest on each Loan shall be due and payable on the Maturity Date.

**SECTION 2.05     Computation of Interest.** All computations of interest shall be made on the basis of a year of 365 or 366 days, as the case may be, and the actual number of days elapsed.

**ARTICLE III**
**CONDITIONS PRECEDENT**

**Section 3.01     Conditions Precedent to Effectiveness of Agreement and Initial Advance.** The effectiveness of this Agreement and the obligation of Lender to make the Initial Advance is subject to the satisfaction of the following conditions precedent (which may only be waived in writing by Lender):

(a)     *Agreement*. Lender shall have received this Agreement, duly executed and delivered by an authorized officer of Debtors.

(b)     *Approvals*. All governmental and third-party approvals necessary in connection with the continuing operations of Debtors, and the transaction contemplated hereby shall have been obtained and be in full force and effect;

(c)     *Interim Order*. The Interim DIP Financing Order shall have been entered by the Bankruptcy Court in the Case within five days of the Petition Date and

19

4928-9616-7304.9

shall be in full force and effect and shall not have been vacated or stayed in any manner without the prior written consent of Lender;

(d)      *Petition Date.* The Petition Date shall have occurred.

(e)      *Cash Management and Other First Day Orders*. All orders entered by the Bankruptcy Court pertaining to cash management (including the Cash Management Order), any motions related to the DIP Facility, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith, shall be in form and substance reasonably satisfactory to Lender.

(f)      *Organizational Documents; Resolutions*. Lender shall have received, in form and substance reasonably satisfactory to it, a certificate of Debtors, certified by a Responsible Officer of Debtors, dated the date hereof, with appropriate insertions and attachments, including:

(i)      a certificate of incorporation, organization, or the like, certified by the relevant authority of the jurisdiction of organization of each Debtor;

(ii)      by-laws, operating agreement or partnership agreement for each Debtor, in form and substance satisfactory to Lender, as in effect on the date on which the resolutions referred to below were adopted; and

(iii)      resolutions or consents of the management boards of Debtors approving the transaction, the appointment of the CRO and the Independent Director, the filing of the Case, and each Loan Document, and of all documents evidencing other necessary corporate action in connection with this Agreement and the Case; and

(g)      *Insurance*. Lender shall have received evidence of insurance coverage in form, scope, and substance satisfactory to Lender and otherwise in compliance with the terms of Section 5.02 and Section 6.05 of this Agreement.

(h)      *Other Deliverables.* Lender shall have received such other deliverables as Lender may reasonably require.

**Section 3.02      Conditions Precedent to Each Loan.** The obligation of Lender to make each Loan requested to be made by it hereunder (including, without limitation, its Initial Advance), is subject to the satisfaction or the waiver by Lender of the following conditions precedent:

(a)      *Representations and Warranties*. Each of the representations and warranties made by Debtors in or pursuant to the Loan Documents shall be true and correct in all material respects (or, as to any representation and warranty that is qualified by materiality or Material Adverse Effect, in all respects) on and as of the

4928-9616-7304.9

date such Loan is made as if made on and as of such date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or, as to any representation and warranty that is qualified by materiality or Material Adverse Effect, in all respects) on such earlier date;

(b) *Additional Documents and Orders*. Any amendments required by Lender to the Prepetition Loan Documents together with any security documents, and other agreements, instruments and documents reasonably required by Lender shall have been executed and delivered by Debtors to Lender, in form and substance acceptable to Lender in its sole and exclusive discretion, and (b) with respect to the Initial Advance, the Interim DIP Financing Order has been entered and has not been vacated, reversed or stayed, appealed (and for which the appeal period has expired or has been waived), or modified or amended without the prior written consent of Lender, and (c) with respect to Loans exceeding the Interim Available Credit, the Final DIP Financing Order has been entered and has not been vacated, reversed or stayed, appealed (and for which the appeal period has expired or has been waived), or modified or amended without the prior written consent of Lender.

(c) *Milestones*. Each of the applicable Milestones set forth in Section 6.04 have been timely satisfied or waived in writing by Lender.

(d) *Approved Budget*. The funds to be advanced under the DIP Facility must be consistent with the Approved Budget and the Lead Debtor has delivered, at least two Business Days prior to the applicable draw date (or such shorter period as the Lender may agree in writing in its sole and exclusive discretion), a Borrowing Notice to Lender.

(e) *No Default*. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Loans requested to be made on such date.

(f) *Competing Plans, Financings or Sales*. Other than as set forth herein, Debtors shall not have executed, entered into or otherwise committed to any plan or restructuring support agreement, debtor-in-possession financing, or any other agreement or understanding concerning the terms of a sale of assets, chapter 11 plan, or other exit strategy without the consent of Lender.

Each borrowing by Debtors hereunder shall constitute a representation and warranty by Debtors, as of the date such Loan is made, that the conditions contained in this ARTICLE III have been satisfied.

21

4928-9616-7304.9

## ARTICLE IV
## PRIORITY AND LIENS

**Section 4.01**       **Status of DIP Obligations; Perfection and Priority of Security Interests.**

(a) *Superpriority Claims*. Subject to the Carve-Out and the Orders), the DIP Obligations shall constitute superpriority Administrative Expense claims against Debtors in the Cases, with administrative priority and senior-secured status under Section 364(c) and 364(d) of the Bankruptcy Code (without the need to file a proof of claim), with priority over any and all other claims, Liens, obligations, liabilities, and indebtedness against Debtors, now existing or hereafter arising, of any kind whatsoever, and including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final DIP Financing Order), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, whether now in existence or hereafter incurred by any Debtor, and shall at all times be senior to the rights of Debtors, Debtors' estates, and any successor trustee, estate representative, or any creditor in the Cases or any subsequent cases or proceedings under the Bankruptcy Code (the "**Lender Superpriority Claim**"). Subject to the Carve-Out and the Orders, Lender Superpriority Claim (i) will be considered Administrative Expenses allowed under Section 503(b) of the Bankruptcy Code, (ii) will have recourse to and be payable from all prepetition and postpetition assets of Debtors, including, but not limited to, the Collateral and all proceeds thereof, (iii) will survive conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, and (iv) shall be entitled to the full protections of section 364(e) of the Bankruptcy Code if the Interim DIP Financing Order or the Final DIP Financing Order or any provision hereof or thereof is vacated, reversed, or modified, on appeal or otherwise.

(b) *Lien on Unencumbered Assets*. The DIP Obligations are, subject to the Carve-Out and the Orders, pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a perfected first priority Liens on all Collateral that is not subject to valid, perfected, and non-avoidable Liens as of the Petition Date and such Liens in favor of Lender are perfected without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

(c) *Priming Lien on Certain Encumbered Assets*. The DIP Obligations are, subject to the Carve-Out and the Orders, pursuant to section 364(c)(1) and 364(d)(1) of the Bankruptcy Code, secured by a perfected first priority, senior priming lien (the "**Priming Lien**") on all the Collateral on which (i) Prepetition Liens were granted as security for the Prepetition Obligations (other than Permitted Priority Liens), or (ii) liens were granted as of the Petition Date that are not permitted under this Agreement or (with respect to statutory liens) applicable law (the "**Primed Liens**"). The Primed Liens shall be primed by and made subject and subordinate to the Priming Lien, which Priming Lien also primes any Adequate Protection Liens

22

4928-9616-7304.9

(excluding those related to Permitted Priority Liens), and the Priming Lien is perfected without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

**SECTION 4.02** **Carve-Out.** The priorities set forth above are subject, in each case, to the Carve-Out. All of the liens and security interests described in Section 4.01 shall be effective and perfected as of the date that the Bankruptcy Court enters the Interim DIP Financing Order, without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents. Debtors shall execute and deliver to Lender (for recordation or filing, as appropriate) such mortgages and pledges (and other security instruments), and be authorized pursuant to the Orders to file such financing statements and other instruments and documents, as shall be advisable (as reasonably determined by Lender) to evidence and secure the DIP Obligations.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES**

To induce Lender to enter into this Agreement and to make the Loans hereunder, Each Debtor hereby represents and warrants to Lender that:

**Section 5.01** **Power; Authorization; Enforceability.**

(a)     Such Debtor has taken all necessary organizational action to authorize the execution, delivery, and performance of the Loan Documents and to authorize the borrowing of Loans on the terms and conditions contained herein. Each Loan Document has been duly executed and delivered by such Debtor.

(b)     This Agreement constitutes, and each other Loan Document when delivered hereunder will constitute, subject to the entry of the Final DIP Financing Order, a legal, valid, and binding obligation of Debtors party thereto, enforceable against each Debtor in accordance with its terms.

**Section 5.02** **No Contravention.** The execution, delivery, and performance of this Agreement and the other Loan Documents, the borrowing of Loans hereunder, and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation of any Debtor and will not result in, or require, the creation or

4928-9616-7304.9

imposition of any Lien on any of their respective properties or assets pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Loan Documents). No Requirement of Law or Contractual Obligation applicable to any Debtor could reasonably be expected to have a Material Adverse Effect.

**Section 5.03        Perfected Security Interest.** The Interim DIP Financing Order is (and the Final DIP Financing Order when entered will be) effective to create in favor of Lender a legal, valid, binding, and enforceable perfected security interest in the Collateral and the proceeds and products thereof, in the priorities provided in Section 4.01, without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents.

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

So long as Debtors have any Available Credit hereunder, or any Loans or any other amounts payable to Lender hereunder or under any other Loan Document have not been paid in full:

**Section 6.01        Budget.**

(a)      Upon Debtors' receipt of Lender's approval (in its sole and exclusive discretion, and in writing, with e-mail notice being sufficient) of a Proposed Budget, such budget shall become an "**Approved Budget**" and shall replace the then-operative Approved Budget for all purposes. The Initial Budget shall be the Approved Budget until such time as a new Proposed Budget is approved, following which such Proposed Budget shall constitute the Approved Budget until a subsequent Proposed Budget is approved. Debtors shall operate in accordance with the Approved Budget and all disbursements shall be consistent with the provisions of the Approved Budget (subject to the Permitted Disbursement Variance). Debtors may submit additional Proposed Budgets to Lender, but until Lender approves such Proposed Budget in writing, it shall not become an Approved Budget and Debtors shall continue to comply with the then-operative Approved Budget.

(b)      Subject to the schedule below, and beginning on the third Monday following the Petition Date (and with each subsequent Monday, collectively and individually, each a "**Reporting Date**"), Debtors shall deliver to Lender, in a form consistent with the form of the Approved Budget, a variance report describing in reasonable detail, by line item (including capital expenditures and professional fees, excluding the fees of Lender's professionals), (i) the actual disbursements of Debtors and actual receipts during the applicable Testing Period (as defined below); (ii) any

24

4928-9616-7304.9

variance (whether positive or negative, expressed as a percentage) between the actual disbursements during such Testing Period against the estimated disbursements for the applicable Testing Period, as set forth in the applicable Approved Budget (each a "**Variance Report**"); and (iii) comments relating to any variances between budgeted and actual disbursements.

(c)      As used herein, "**Testing Period**" shall mean the cumulative period from the beginning date of the Approved Budget through the Sunday that is eight calendar days prior to the applicable Reporting Date. The last day of each Testing Period shall be a "**Testing Date**". As of any applicable Testing Date, actual cumulative disbursements (excluding Lender professional fees and Allowed Professional Fees) on an aggregate basis (the "**Actual Disbursement Variance**") shall not exceed budgeted cumulative disbursements (excluding Lender professional fees and Allowed Professional Fees) on an aggregate basis as reflected in the Approved Budget for such period, by more 10% (the "**Permitted Disbursement Variance**"). If the Actual Disbursement Variance for such period is less than or equal to the Permitted Disbursement Variances, the amount by which each Actual Disbursement Variance is less than the Permitted Disbursement Variance shall be carried forward to the next Testing Date and added to the Permitted Disbursement Variance for such next Testing Date. Debtors shall be deemed to be in compliance with the Approved Budget for all purposes under this Agreement and the DIP Financing Orders unless, as of any Testing Date, Debtors' actual disbursements vary from the Approved Budget by more than the applicable Permitted Disbursement Variance as measured on any Testing Date (the "**Variance Covenant**"). Lender may, in its sole and exclusive discretion, waive or extend any Approved Budget, Variance Report, or approval procedures, provided such procedure change is not more onerous or otherwise adverse to Debtors.

**Section 6.02**       **Conference Call.** On a weekly basis on a day and time to be mutually agreed upon, the CRO shall hold a telephonic conference with Lender and any financial advisor or other consultant of Lender to provide updates relative to (a) the Cases, and (b) the Approved Budget and relevant portions of the Cases, including actual performance against the Approved Budget (including but not limited to any Actual Disbursement Variances and any other relevant matters), status of the Sale process, Debtors' operating performance, and any business updates.

**Section 6.03**       **Other Information.** Debtors shall furnish the following to Lender upon Lender's request:

(a)      Copies of all notices, requests, and other documents received by any Debtor under or pursuant to any Material Contract or instrument, indenture, or loan agreement regarding or related to any breach or default by any party thereto or any

4928-9616-7304.9

other event that could materially impair the value of the interests or the rights of any Debtor or otherwise have a Material Adverse Effect, and such information and reports regarding Material Contracts and such instruments, indentures, and loan agreements as Lender may reasonably request from time to time; and

(b)    Such other information respecting the business, condition (financial or otherwise), operations, performance, properties, or prospects of Debtors as Lender may from time to time reasonably request.

**Section 6.04    Milestones.** Debtors shall comply with the following deadlines (each of which may be extended or waived with the prior written consent of Lender, which may be by email, without further order of the Bankruptcy Court) (collectively, the "**Milestones**"):

(a)    The Bankruptcy Court shall have entered the Interim DIP Financing Order by no later than five days from the Petition Date (the "**Interim DIP Financing Order Deadline**").

(b)    The Bankruptcy Court shall have entered the Final DIP Financing Order by no later than 35 days from the Petition Date (the "**Final DIP Financing Order Deadline**").

(c)    Debtors shall file, (i) by no later than 14 days from the Petition Date, a bidding procedures motion, and (ii) within three days following the entry of the order approving the bidding procedures, a sale motion to sell all or substantially all of Debtors' assets through a sale pursuant to section 363 of the Bankruptcy Code (the "**Sale**"), which motions shall be in form and substance reasonably acceptable to Lender (collectively, the "**Sale Motion**").

(d)    The Bankruptcy Court shall have entered an order approving the bidding procedures contemplated by the Sale Motion by no later than 35 days from the Petition Date.

(e)    The Bankruptcy Court shall have entered an order approving the Sale by no later than 90 days from the Petition Date, and such order shall be in form and substance acceptable to Lender in its sole and exclusive discretion and Debtors (the "**Sale Approval Deadline**").

(f)    Unless otherwise provided in the order approving the Sale or as otherwise agreed by Lender, the Sale shall be consummated by no later than five days following entry of the order approving the Sale.

The extension of any Milestone is subject to the consent of Lender at its sole and exclusive discretion. For the avoidance of doubt, Lender reserves the right to amend the dates set forth for each of the Milestones in a proposed Final DIP Financing Order to be filed with the Court before any such hearing to consider entry of the Final DIP Financing Order.

26

**Section 6.05       Maintenance of Insurance.** Maintain insurance with respect to its property and business (including without limitation, property and casualty and business interruption insurance) with financially sound and reputable insurance companies, in such amounts and covering such risks as are currently maintained.

**Section 6.06       Inspection of Property; Books and Records; Discussions.** Each Debtor shall:

(a)       Keep proper books of records and accounts, in which full, true, and correct entries in all material respects and in any event in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions and assets in relation to its business and activities;

(b)       During normal business hours and without interruption of operations: (a) afford Lender and its Representatives full and free access to and the right to inspect and appraise all of the properties, assets, premises, bank accounts, books and records, contracts and other documents (other than such documents and records subject to attorney/client privilege and attorney work product privilege) and data related to the assets of Debtors; and (b) furnish Lender and its Representatives with such financial, operating and other data and information (other than such documents and records subject to attorney/client privilege and attorney work product privilege) related to such assets as Lender or any of its Representatives may reasonably request. Lender and its Representatives shall be entitled to meet with key personnel as requested, except that Debtors' counsel will meet with Lender's counsel upon Lender's counsel's request as to matters that are not subject to attorney/client privilege; and

(c)       At all times comply with the terms and conditions set forth in the Loan Documents and the Prepetition Loan Documents.

**Section 6.07       Use of Proceeds.** Debtors will use the proceeds of the Loans solely to (a) pay reasonable costs, fees, and expenses of Lender associated with the transactions contemplated by this Agreement and the other Loan Documents, including the reasonable and documented fees and out-of-pocket expenses incurred or accrued by Lender and its counsel, Miller Nash LLP and Royer Cooper Cohen Braunfeld LLC, and any financial advisor retained by Lender in connection with the Cases, (b) pay for reasonable Administrative Expenses not to exceed the Carve-Out, and (c) provide ongoing working capital requirements of Debtors and to pay for fees, costs, and expenses relating to the Cases (other than fees, costs, and

27

4928-9616-7304.9

expenses referred to in clause (b)), each in accordance with the Approved Budget. None of the Carve-Out, the Loans, or the Collateral may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to, the DIP Facility, this Agreement, the Prepetition Loan Documents, or the Loan Documents, or the security interests and liens securing any of the DIP Obligations or Prepetition Obligations, or to fund prosecution or assertion of any claims, or to otherwise litigate against Lender, except that up to $25,000 of Cash Collateral may be used to pay the allowed fees and expenses incurred solely by the Creditors' Committee, if any, in investigating (but not commencing or prosecuting), the validity, enforceability, perfection, priority, or extent of the prepetition liens and claims of Lender and other prepetition creditors of Debtors.

**Section 6.08 Compliance DIP Financing Orders and Approved Budget**. Debtors shall at all times, (a) comply with the DIP Financing Orders and each other order entered by the Bankruptcy Court in the Cases and all applicable laws, rules and regulations, and (b) comply with the Approved Budget, subject to the Permitted Disbursement Variance. Debtors shall provide Lender and its counsel with draft copies of all material motions, applications, supporting papers and notices prepared by any Debtor (including forms of orders and notices to interested parties) relating to the assumption and assignment of any material executory contract or unexpired lease, or otherwise relating to the transactions contemplated by the Sale not later than two Business Days prior to filing, except in cases of emergency, and then as soon as practicable.

**Section 6.09 Waiver of Certain Claims**. Debtors irrevocably waive and are prohibited from asserting any claim described in the definition of Final DIP Financing Order, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by Lender upon the Collateral. Subject to entry of the Final DIP Financing Order, Debtors and their estates shall be deemed to have irrevocably

4928-9616-7304.9

waived and have agreed not to assert any claim or right under sections 552 or 726 of the Bankruptcy Code to avoid the imposition of the Liens of Lender on any property acquired by any of Debtors or any of their estates or to seek to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by, Lender upon the Collateral.

Section 6.10 **Material Actions in the Bankruptcy Case**. Debtors agree to provide Lender and its counsel with draft copies of all material motions, applications, supporting papers and notices prepared by any Debtor (including forms of orders and notices to interested parties) relating to the assumption and assignment of any executory contract or unexpired lease, or otherwise relating to the transactions contemplated by the Sale not later than two Business Days prior to filing, except in cases of emergency, and then as soon as practicable.

Section 6.11 **Further Assurances.** Promptly upon the request of Lender, the Debtors shall:

(a) Correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgement, filing, or recordation thereof.

(b) Do, execute, acknowledge, deliver, record, re-record, file, re-file, register, and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignments, transfers, certificates, assurances, and other instruments as Lender may reasonably require from time to time in order to:

(i) carry out more effectively the purposes of the Loan Documents;

(ii) to the fullest extent permitted by applicable law, subject Debtors' properties, assets, rights, or interests to the Liens now or hereafter intended to be covered by the Collateral Documents and the other Loan Documents;

(iii) perfect and maintain the validity, effectiveness and priority of the Liens intended to be created under the Collateral Documents and the other Loan Documents; and

29

4928-9616-7304.9

(iv)     assure, convey, grant, assign, transfer, preserve, protect, and confirm more effectively to Lender, the rights granted or now or hereafter intended to be granted to Lender under any Loan Document or under any other instruments executed in connection with any Loan Document to which any Debtor is or is to be a party.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as the Debtors have any Available Credit hereunder, or any Loans or any other amounts payable to Lender hereunder or under any other Loan Document have not been paid in full, no Debtor shall:

**Section 7.01     Limitation on Debt.** Create, incur, assume, permit to exist, or otherwise become liable with respect to any Debt, except:

(a)     Debt of Debtors existing or arising under this Agreement and any other Loan Document; and

(b)     Debt existing on the date hereof.

**Section 7.02     Limitation on Liens.** Create, incur, assume, or permit to exist any Lien on any property or assets now owned or hereafter acquired by it or on any income or rights in respect of any thereof, except:

(a)     Liens created pursuant to or arising under any Loan Document;

(b)     Liens in favor of Prepetition Secured Parties that may be granted certain adequate protection liens, claims and other entitlements with respect to the potential diminution in value of their interests in the Prepetition Collateral (the "**Adequate Protection Liens**") by the Bankruptcy Court, so long as the Adequate Protection Liens are subject and junior to the DIP Liens (including any liens to which the DIP Liens are junior but excluding Permitted Priority Liens) and the Carve-Out, but otherwise retain their respective priorities in the Prepetition Collateral, including the Prepetition Liens and any lien or security interest that is avoided and preserved for the benefit of Debtors and their respective estates under section 551 of the Bankruptcy Code;

(c)     Liens imposed by law for taxes, assessments, or governmental charges not yet due or that are being contested in good faith and by appropriate proceedings diligently conducted if, unless the amount is not material with respect to it or its financial condition, adequate reserves with respect thereto are maintained in accordance with GAAP on the books of the applicable Person;

(d)     Carriers', warehousemen's, mechanics', materialmen's, repairmen's, and other similar Liens imposed by law, arising in the ordinary course of business,

and securing obligations that are not overdue by more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted;

(e)       Liens arising solely by virtue of any statutory or common law provision relating to banker's liens rights or set-off or similar rights;

(f)       Pledges and deposits and other Liens (i) made in the ordinary course of business in compliance with workers' compensation, unemployment insurance, and other social security laws or regulations and (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty, or liability insurance to Debtors;

(g)       Liens (including deposits) to secure the performance of bids, tenders, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds, and other obligations of like nature, in each case in the ordinary course of business;

(h)       Easements, zoning restrictions, rights-of-way, minor defects or irregularities in title, and similar encumbrances on real property imposed by law or arising in the ordinary course of business that, in the aggregate, are not material in amount and which do not materially detract from the value of the affected property or interfere materially with the ordinary conduct of business of Debtors; and

(i)       Liens in existence as of the Petition Date.

**Section 7.03          Mergers; Nature of Business; Organizational Documents.**

(a)       Merge into, or consolidate or amalgamate with, any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, license, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets, or issue, sell, transfer or otherwise dispose of any equity interests of any Debtor or any subsidiary of any Debtor, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person or any division, unit or business of any other person, other than (i) asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to Lender in its reasonable discretion or is otherwise in accordance with the Approved Budget, (ii) asset sales in the ordinary course of business and consistent with past practice, and (iii) dispositions of obsolete, worn out, used or surplus property in the ordinary course of business and consistent with past practice.

(b)       Engage in any business other than businesses of the type conducted by Debtors on the date hereof and businesses reasonably related thereto.

(c)       Modify or alter its organizational documents, except as required by the Bankruptcy Code or a plan of reorganization and otherwise acceptable to Lender.

31

4928-9616-7304.9

**Section 7.04     Limitation on Investments and New Accounts.**

(a)     Make any advance, loan, extension of credit (by way of guaranty or otherwise), or capital contribution to, or purchase, hold, or acquire any Equity Interests, bonds, notes, debentures, or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, "**Investments**"), except:

      (i)     Investments in Cash Equivalents; and

      (ii)     Investments existing on the date hereof; and

      (iii)     Extensions of trade credit in the ordinary course of business (including any instrument evidencing the same and any instrument, security, or other asset acquired through bona fide collection efforts with respect to the same).

(b)     Open any new deposit or securities accounts; provided however, Debtors may open deposit or securities accounts if such account is pledged to Lender and Lender has received an account control agreement in form and substance reasonably acceptable to Lender

**Section 7.05     Limitation on Dispositions.** Dispose of any of its property, whether now owned or hereafter acquired, or issue or sell any Equity Interests to any Person, except:

(a)     The sale or Disposition of machinery and equipment no longer used or useful in the business of Debtors;

(b)     The Disposition of obsolete or worn-out property in the ordinary course of business;

(c)     The sale of inventory and immaterial assets in the ordinary course of business; and

(d)     Dispositions of cash in accordance with the Budget and as permitted by the Cash Management Order.

**Section 7.06     Additional Bankruptcy Matters**. Do any of the following:

(a)     *Certain Payments*. Except as expressly provided or permitted hereunder (including, without limitation, to the extent pursuant to any First Day Order or "second day" order complying with the terms of this Agreement) or as provided pursuant to any other order of the Bankruptcy Court, make any payment or distribution to any non-Debtor affiliate or corporate insider outside of the ordinary course of business.

32

4928-9616-7304.9

(b)     *DIP Order Amendments*. Make or permit to be made any changes to the Interim DIP Financing Order or the Final DIP Financing Order, unless approved by Lender.

(c)     *Alternative Financing*. Seek any other debtor-in-possession financing with liens senior or pari passu to Lender's Liens during the pendency of its bankruptcy proceedings without the prior written consent of Lender, which may withhold such consent in its sole discretion.

(d)     *New Liens*. Grant any new Liens in favor of any Person (other than Lender) on any of the Collateral, or seek to prime any Lien of Lender on any of the Collateral.

(e)     *Budget.* Allow proceeds of the Loans as of any week to exceed the aggregate amount of operating and non-operating disbursements permitted for such week as set forth in the Approved Budget, subject to any Permitted Disbursement Variance.

(f)     *Cash Collateral*. Allow Use of Prepetition Cash Collateral for any purpose other than payment of the Prepetition Obligations, the investigation contemplated by Section 6.07, or as otherwise ordered by the Bankruptcy Court.

(g)     *Material Executory Contracts*. Assume or reject any material executory contract or unexpired lease, without consent of Lender, not to be unreasonably withheld, conditioned or delayed.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**Section 8.01     Events of Default.** Each of the following events or conditions shall constitute an "**Event of Default**" (whether it shall be voluntary or involuntary or come about or be affected by any Requirement of Law or otherwise):

(a)     *Payment Default or Termination*. Debtors fail to pay any principal or interest of any Loan when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment, or otherwise, or the Maturity Date occurs;

(b)     *Failure of Representation or Warranty*. Any representation, warranty, certification, or other statement of fact made or deemed made by or on behalf of any Debtor herein or in any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder or in any certificate, document, report, financial statement, or other document furnished by or on behalf of any Debtor under or in connection with this Agreement or any other Loan Document, proves to have been false or misleading in any material respect on or as of the date made or deemed made;

4928-9616-7304.9

(c)      *Breach of Affirmative/Negative Covenants*. Debtors fail to perform or observe any covenant, term, condition, or agreement contained in Section 6.07 or **Article 7**;

(d)      *Other Covenants, Terms, and Conditions*. The failure of the Debtors to (a) comply with the Variance Covenant, (b) have an Approved Budget; (c) comply with any covenant or agreement contained in the DIP Financing Orders or the Loan Documents in any respect or (d) comply with any other covenant or agreement contained in Agreement or the Loan Documents subject, (i) in the case of the foregoing clause (c), a grace period of five Business Days after receipt by Debtors, the Committee, and the U.S. Trustee of written notice thereof, and (ii) in the case of the foregoing clause (d), to a grace period of two Business Days.

(e)      *Lack of Security Interest*. Any Lien created under the Interim DIP Financing Order or the Final DIP Financing Order, as applicable, or any other Collateral Document, ceases to be, or is asserted by any Debtor not to be, a valid and perfected lien, with the priority required by the applicable Collateral Document, Interim DIP Financing Order, or Final DIP Financing Order, as the case may be, except as a result of a disposition of the applicable collateral in a transaction permitted under this Agreement or as otherwise expressly permitted hereunder or under the applicable Collateral Document.

(f)      *Surcharge*. Lender or the Collateral is surcharged pursuant to sections 105, 506(c), or any other section of the Bankruptcy Code.

(g)      *Dismissal of Cases; Appointment of Trustee*. Any Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtor files a motion or other pleading seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise; or a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or an examiner with expanded powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code is appointed in the Case. Any order by the Bankruptcy Court is entered terminating or modifying the exclusivity right of Debtors to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code.

(h)      *Superpriority Claims*. An order of the Bankruptcy Court is entered granting any to any Person in any of the Cases a claim, lien, or security interest that is *pari passu* with or senior to the claims, liens, or security interests of Lender against Debtors hereunder (including Lender Superpriority Claim and the Priming Lien), or any Debtor takes any action seeking or supporting the grant of any such claim, lien, or security interest, in each case except as expressly permitted hereunder.

(i)      *Final DIP Financing Order*. The Final DIP Financing Order has not been entered by the Bankruptcy Court and become a Final Order within 35 days after the Petition Date.

4928-9616-7304.9

(j)     *Avoidance*. An order of the Bankruptcy Court shall be entered avoiding any portion of the payments made on account of the DIP Obligations.

(k)     *Challenge to Order*. The Interim DIP Financing Order or Final DIP Financing Order, as applicable, fails to be in full force and effect, including by the entry of an order (i) reversing or vacating the Interim DIP Financing Order or Final DIP Financing Order, (ii) amending or modifying the Interim DIP Financing Order or Final DIP Financing Order in a manner that is adverse to Lender, or (iii) staying for a period in excess of five days the Interim DIP Financing Order or Final DIP Financing Order (as applicable).

(l)     *Debtor Challenges*. Any Debtor (a) engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility, the Prepetition Obligations, or the liens on or security interest in the assets of the Debtors securing the DIP Obligations or the Prepetition Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing such indebtedness or (b) engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against Lender, except that Debtor's response to subpoenas (or document production in lieu of a subpoena), discussions with representatives of the Committee, interviews and depositions will not be considered support.

(m)     *Objection to Lender Claims or Liens*. An order by the Bankruptcy Court is entered in favor of the Committee or any other statutory committee appointed in the Cases by the U.S. Trustee, or any other party in interest, (a) sustaining an objection to claims of Lender, or (b) avoiding any Liens held by Lender.

(n)     *Relief from the Automatic Stay*. The Bankruptcy Court enters an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to allow any one or more creditors to execute upon or enforce liens on or security interests in any assets of Debtors that have a fair market value in excess of $100,000 in the aggregate.

(o)     *Compliance with Orders*. Any Debtor fails to comply, in any material respect, with the terms of the Orders, and such failure shall remain unremedied for more than five business days after receipt by Debtors, the Committee, and the U.S. Trustee of written notice thereof.

(p)     *Prepetition Payments*. Any Debtor makes any Prepetition Payment other than (i) as permitted by the Interim DIP Financing Order or the Final DIP Financing Order, (ii) as otherwise permitted by this Agreement, and (iii) payments authorized by the Bankruptcy Court and that are set forth in the Approved Budget to the extent authorized by one or more First Day Orders or other orders reasonably satisfactory to Lender.

(q)     *Sale of Assets*. The Bankruptcy Court enters an order authorizing the sale of any material portion of Debtors' assets, unless, in the case of each of the foregoing, either (i) (A) Lender consents to the filing of such motion, and (B) any

35

4928-9616-7304.9

order approving the sale expressly provides for application of cash proceeds in accordance with the terms of this Agreement and is otherwise in form and substance reasonably acceptable to Lender; or (ii) the order approving such sale contemplates payment in full in cash of the DIP Obligations and Prepetition Obligations upon consummation of such sale).

(r) *Chapter 11 Milestones*. The failure of Debtors timely to perform any Milestone.

(s) *Other DIP Financing*. Debtors petition the Bankruptcy Court to obtain additional financing equal or senior to the DIP Facility.

(t) *Exclusivity*. Any Debtor's "exclusive period" under section 1121 of the Bankruptcy Code for the filing of a plan of reorganization terminates.

(u) *Actions in Support of Breach*. Any Debtor files any application or pleading with the Bankruptcy Court or otherwise consents to any matters set forth above that would constitute an Event of Default (unless Lender consents to such filing or consent).

(v) *Judgments*. One or more judgments or decrees is entered against any Debtor by a court of competent jurisdiction involving, in the aggregate, a liability (not paid or fully covered by insurance as to which the relevant insurance company has been notified and has not denied coverage, or for such Debtor has not set aside adequate reserves on its balance sheet) in an amount in excess of $500,000 and all such judgments or decrees have not been vacated, discharged, stayed, or bonded pending appeal within 30 days from the entry thereof.

(w) *Loan Documents*. Any material provision of any Loan Document ceases for any reason to be valid, binding, and in full force and effect, other than as expressly permitted hereunder or thereunder.

(x) *Change of Control*. Any Change of Control occurs, or the resignation or removal of the CRO or the Independent Director for any reason unless approved in advance by Lender in its sole and exclusive discretion.

**Section 8.02 Remedies Upon Event of Default.** Upon the occurrence and during the continuance of any Event of Default, and without further application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit Lender to take any of the following actions, at the same or different time:

(a) issue a written notice (the "**Remedies Notice**") (which may be by email) to Debtors and their counsel, the Committee and its counsel, and the U.S. Trustee (the "**Remedies Notice Parties**") declaring the occurrence of the Maturity Date due to an Event of Default;

36

4928-9616-7304.9

(b)　　issue a Carve-Out Trigger Notice;

(c)　　declare all DIP Obligations to be immediately due and payable without presentment, demand, or protest, or other notice of any kind, all of which are expressly waived by Debtors;

(d)　　declare the suspension or termination of the DIP Facility as to any further liability or obligation of Lender thereunder, but without affecting the DIP Liens or DIP Obligations (the "**Termination Notice**"); and

(e)　　charge the default rate of interest under the DIP Facility.

During the five business days immediately following the date Lender delivers a Remedies Notice to the Remedies Notice Parties (the "**Remedies Notice Period**"), Lender, the Committee and/or Debtors may seek an emergency hearing (a "**Stay Relief Hearing**") to determine whether an Event of Default has occurred, and the filing of any such motion shall toll the Remedies Notice Period. In the event the Bankruptcy Court determines during a Stay Relief Hearing that an Event of Default has occurred, the Court may fashion an appropriate remedy, which may include the exercise of any and all rights available to Lender under this Agreement, the Interim DIP Financing Order, and/or the Final DIP Financing Order, as applicable.

Upon expiration of the Remedies Notice Period and upon any other occurrence of the Maturity Date, unless a motion seeking emergency relief has been filed or unless ordered otherwise by the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified without further order of the Bankruptcy Court to the extent necessary to permit Lender to exercise any and all remedies against the Collateral permitted under state law.

Debtors shall not seek to enjoin, hinder, delay, or object to Lender's exercise of rights and remedies in accordance with this Agreement, and at any proceeding with respect to Lender's exercise of rights and remedies, Debtors cannot raise any substantive objections, other than to challenge the occurrence of the relevant Event of Default at a Stay Relief Hearing.

**ARTICLE IX**
**MISCELLANEOUS**

　　　　　　**Section 9.01　　　Notices.**

(a)　　Except in the case of notices and other communications expressly permitted to be given by telephone (or by e-mail as provided in paragraph (b) below), all notices and other communications provided for herein shall be made in writing and mailed by certified or registered mail, delivered by hand or overnight courier service, or sent by facsimile as follows:

(i)　　If to Debtors, to it at [ADDRESS], Attention of Scott Avila (savila@paladinmgmt.com), with a copy to Zev Shechtman

37

(**zev.shechtman@saul.com**) and Jeffrey Hampton (jeffrey.hampton@saul.com).

      (ii)      If to Lender, it at Mark Smith (**Mark.smith@conterraag.com**) and Trisha Lillie (**Trisha.lillie@conterrag.com**) 5465 Mills Civic Pkwy, Suite 201, West Des Moines, IA 50266, with a copy to Bernie Kornberg (Bernie.Kornberg@MillerNash.com) and Marc Hirschfield (MHirschfield@rccblaw.com).

      Notices mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received. Notices sent by facsimile during the recipient's normal business hours shall be deemed to have been given when sent (and if sent after normal business hours shall be deemed to have been given at the opening of the recipient's business on the next Business Day).

      (b)      Notices and other communications to Lender hereunder may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites) pursuant to procedures approved by Lender. Lender or Lead Debtor (on behalf of Debtors) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that, approval of such procedures may be limited to particular notices or communications.

      (c)      Unless Lender specifies otherwise:

      (i)      notices and other communications sent by e-mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail, or other written acknowledgment); and

      (ii)      notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor;

      provided that, if such notice, e-mail or other communication is not sent during the recipient's normal business hours, such notice, e-mail, or communication shall be deemed to have been sent at the recipient's opening of business on the next Business Day.

      (d)      Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties.

            **Section 9.02**      **Amendments and Waivers.**

38

4928-9616-7304.9

(a)     No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power, or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law. No waiver of any provision of any Loan Document or consent to any departure by any Debtor therefrom shall in any event be effective unless the same shall comply with paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, or modified except by Debtors and Lender.

**Section 9.03       Expenses; Damage Waiver.**

(a)     Debtors agree to pay:

(i)     all reasonable out-of-pocket expenses incurred by Lender, including the reasonable fees, charges, and disbursements of counsel for Lender in connection with the preparation, negotiation, execution, delivery, and administration of the Loan Documents and any amendments, waivers, or other modifications of the provisions of any Loan Document (whether or not the transactions contemplated by the Loan Documents are consummated) and;

(ii)     all out-of-pocket expenses incurred by Lender, including the reasonable fees, charges, and disbursements of any counsel for Lender, in connection with the enforcement or protection of its rights (i) in connection with the Loan Documents, including its rights under this Section 9.03 or (ii) in connection with the Loans issued under this Agreement.

(b)     Each Debtor agrees, to the fullest extent permitted by applicable law, not to assert, and hereby waives, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential, or punitive damages (including, without limitation, any loss of profits or anticipated savings), as opposed to actual or direct damages, resulting from this Agreement or any other Loan Document or arising out of such Indemnified Party's activities in connection herewith or therewith (whether before or after the Effective Date).

(c)     All amounts due under Section 9.03 shall be payable not later than five Business Days after demand is made for payment by Lender.

39

4928-9616-7304.9

**Section 9.04    Successors and Assigns.**

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Debtor may assign or otherwise transfer any of its rights or obligations hereunder (and any attempted assignment or transfer by any Debtor without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of Lender) any legal or equitable right, remedy, or claim under or by reason of this Agreement.

(b)    Lender may, at any time, without the consent of Debtors but with concurrent notice to Debtors, assign to one or more Eligible Assignees (as defined below) all or a portion of its rights and obligations under this Agreement (including all or a portion of the Available Credit and the Loans at the time owing to it). For purposes of this Agreement, "**Eligible Assignee**" means any Person other than a natural Person that is (i) an Affiliate of Lender, (ii) a commercial bank, insurance company, investment or mutual fund, or other Person that is an "accredited investor" (as defined in Regulation D under the Securities Act), or (iii) a corporate entity that possesses financial wherewithal similar to that of Lender. Subject to notification of an assignment, the assignee shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of Lender under this Agreement, and Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in the case of an assignment covering all of Lender's rights and obligations under this Agreement, Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 9.03). Each Debtor hereby agrees to execute any amendment and/or any other document that may be necessary to effectuate such an assignment, including an amendment to this Agreement to provide for multiple lenders and an Lender to act on behalf of such lenders. Any assignment or transfer by Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

**Section 9.05    Survival.** All covenants, agreements, representations, and warranties made by Debtors in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Lender may have notice or knowledge of any Event of Default or incorrect representation or

40

4928-9616-7304.9

warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of, or any accrued interest on, any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Available Credit has not expired or terminated. The provisions of ARTICLE IX shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Available Credit, or the termination of this Agreement or any provision hereof.

**Section 9.06     Counterparts; Integration; Effectiveness.**

(a)     This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents, and any separate letter agreements with respect to fees payable to Lender constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect to the subject matter hereof. Except as provided in Section 3.01, this Agreement shall become effective when it shall have been executed by Lender and when Lender shall have received a counterpart hereof executed by Debtors. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic ("pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)     The words "execution," "signed," "signature," and words of similar import in any Loan Document shall be deemed to include electronic or digital signatures or electronic records, each of which shall be of the same effect, validity, and enforceability as manually executed signatures or a paper-based recordkeeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 USC § 7001 et seq.), the Uniform Electronic Transactions Act (UETA), or any state law based on the UETA, including the New York Electronic Signatures and Records Act (N.Y. Tech. §§ 301 to 309).

**Section 9.07     Severability.** If any term or provision of any Loan Document is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision thereof or invalidate or render unenforceable such term or provision in any other jurisdiction.

41

4928-9616-7304.9

**Section 9.08** **Right of Setoff.** If an Event of Default shall have occurred and be continuing, Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and appropriate and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by Lender or Affiliate to or for the credit or the account of Debtors against any and all of the obligations of Debtors now or hereafter existing under the Loan Documents to Lender or its Affiliates, whether direct or indirect, absolute or contingent, matured or unmatured, and irrespective of whether or not Lender or any Affiliate shall have made any demand under the Loan Documents and although such obligations of Debtors are owed to a branch, office, or Affiliate of Lender different from the branch, office, or Affiliate holding such deposit or obligated on such indebtedness. Lender agrees to notify Lead Debtor promptly after any such set off and appropriation and application; provided that the failure to give such notice shall not affect the validity of such set off and appropriation and application.

**Section 9.09** **Governing Law; Jurisdiction; Consent to Service of Process.**

(a)     This Agreement and the other Loan Documents and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of California, without regard to conflicts of laws principles.

(b)     Each Debtor irrevocably and unconditionally agrees that it will not commence any action, litigation, or proceeding of any kind whatsoever, whether in law or equity, or whether in contract or tort or otherwise, against Lender or any of its Related Parties in any way relating to this Agreement or any other Loan Document or the transactions contemplated hereby or thereby, in any forum other than the Bankruptcy Court, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees that any such action, litigation, or proceeding may be brought in any such court, unless the Bankruptcy Court does not have or does not exercise jurisdiction then in any state or federal court of competent jurisdiction in the city of Fresno, California and shall waive any right to trial by

4928-9616-7304.9

jury. Each of the parties hereto agrees that a final judgment in any such action, litigation, or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing herein or in any other Loan Document shall affect any right that Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Debtor or its properties in the courts of any jurisdiction following relief from the automatic stay.

(c)     Each Debtor irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any such court referred to in subsection (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each Debtor irrevocably consents to the service of process in the manner provided for notices in Section 9.01 and agrees that nothing herein will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

**Section 9.10     New Value.** It is the intention of Debtors and Lender that the granting of the Collateral to Lender as a condition to and in connection with the making of the Loans by Lender be and is a contemporaneous exchange for new value given by Lender to Debtors[1].

**Section 9.11     Waiver of Jury Trial.** EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY. EACH PARTY HERETO (A) CERTIFIES THAT NO AGENT, ATTORNEY, REPRESENTATIVE, OR ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF LITIGATION AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND

---

[1] **NTD:** Please explain why this was stricken.

43

4928-9616-7304.9

THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.12    No Fiduciary Duties. Lender may have economic interests that conflict with those of Debtors and their stakeholders. Each Debtor agrees that nothing in the Loan Documents or otherwise related to the transactions contemplated thereby will be deemed to create an advisory, fiduciary, or agency relationship or fiduciary or other implied duty between Lender, on the one hand, and Debtors, on the other hand. The parties hereto acknowledge and agree that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial between Lender, on the one hand, and Debtors, on the other hand, and (ii) in connection therewith and with the process leading thereto, (x) Lender has not assumed an advisory or fiduciary responsibility in favor of Debtors or their stakeholders with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto or any other obligation to Debtors except the obligations expressly set forth in the Loan Documents and (y) Lender is acting solely as principal and not as the agent or fiduciary of Debtors or its equity holders, affiliates, creditors or any other Person. Each Debtor acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.

Section 9.13    Payment of Expenses. Subject to the terms and requirements set forth in the Interim DIP Financing Order and the Final DIP Financing Order, the reasonable and documented fees and out-of-pocket expenses incurred or accrued by Lender and its counsel, Miller Nash LLP and Royer Cooper Cohen Braunfeld LLC, and any financial advisor retained by Lender in connection with the Cases (the foregoing to include all unpaid reasonable and documented prepetition fees, out-of-pocket costs and expenses incurred by Lender in

44

connection with the DIP Facility) in connection with any and all aspects of the Cases shall be timely paid upon receipt of an invoice or other request for payment in accordance with the DIP Financing Orders.

Section 9.14 **Indemnification**. Debtors agree to indemnify and hold harmless Lender (solely in its capacity as Lender) and its affiliates and each of their officers, directors, employees, agents, advisors, attorneys and representatives (each, an "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable and documented fees and out-of-pocket expenses of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the DIP Facility, or any of transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any of Debtors, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

Section 9.15 **Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

[SIGNATURE PAGE FOLLOWS]

45

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**LENDER:**

CONTERRA AGRICULTURAL CAPITAL, LLC

By: _____
Name: _____
Its: _____

4928-9616-7304.9

**DEBTORS:**

HRONIS CAPITAL ASSETS, LP

By: _____
Name: _____
Its: _____

HRONIS CAPITAL MANAGEMENT, LLC

By: _____
Name: _____
Its: _____

HRONIS CITRUS, LLC

By: _____
Name: _____
Its: _____

HRONIS FARMING, LP

By: _____
Name: _____
Its: _____

HRONIS FRUIT COMPANY LLC

By: _____
Name: _____
Its: _____

HRONIS, INC.

By: _____
Name: _____
Its: _____

HRONIS LAND COMPANY

By: _____
Name: _____
Its: _____

HRONIS RANCH, LLC

By: _____
Name: _____
Its: _____

HRONIS RESOURCE MANAGEMENT, LLC

By: _____
Name: _____
Its: _____

THE HRONIS FAMILY LIMITED PARTNERSHIP

By: _____
Name: _____
Its: _____

47

4928-9616-7304.9

**SCHEDULE 1.01(A) Real Property**

SCHEDULE 1.01(A)

<u>EXHIBIT A</u>

**THE LAND REFERRED TO HEREIN BELOW IS SITUATED UNINCORPORATED AREA OF TULARE, COUNTY OF TULARE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:**

**<u>TRACT A</u>**

**<u>PARCEL 1: APN: 318-010-002</u>**

The Southwest quarter of the Northwest quarter of Section 26, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the rights or interest in said land conveyed to the County of Tulare, by deed recorded December 8, 1908 in Book 9, Page 282 of Rights of Way, which deed conveys a strip of land to be used as a public highway over the West 25 feet of the Northwest quarter of said Section 26.

Also Excepting therefrom an undivided one-half of all oil, gas and other hydrocarbon substances in and under said real property and the right to remove the same, as reserved by F.C. Drumm and Dona Mabel Drumm, husband and wife, in deed recorded December 27, 1956 in Book 1965, Page 56 as Document No. 38535 of Official Records.

Also Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved by Lee W. Halverstadt and Dorothy W. Halverstadt, husband and wife, in deed recorded June 30, 1993 as Document No. 93-046030 of Official Records.

Also Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved by Betty Lou Halverstadt, in deed recorded June 30, 1993 as Document No. 93-046031 of Official Records.

**<u>PARCEL 2: APN: 318-020-005</u>**

Lots 1 and 8 of Earlimart Colony Lands, in Section 26, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded March 16, 1908 in Book 8, Page 26 of Maps, in the office of the County Recorder of said County.

Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved by Lee W. Halverstadt and Dorothy W. Halverstadt, husband and wife, in deed recorded June 30, 1993 as Document No. 93-046030 of Official Records.

Also Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved by Betty Lou Halverstadt, in deed recorded June 30, 1993 as Document No. 93-046031 of Official Records.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

## PARCEL 3: APN: 318-020-016

Parcel 2 of Lot Line Adjustment No. PLA 93-028, in the unincorporated area, County of Tulare, State of California, according to the decision of the Planning and Development Director of the County of Tulare approving Lot Line Adjustment Map No. PLA 93-028, recorded July 29, 1993 as Document No. 93-52969 of Official Records, in the office of the County Recorder of said County, and is described as follows:

Lots 7 and 10 of Earlimart Colony Lands, in Section 26, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded March 16, 1908 in Book 8, Page 26 of Maps, in the office of the County Recorder of said County.

Excepting therefrom the South 200.00 feet of the East 325.00 feet of said Lot 7.

## PARCEL 4: APN: 318-020-011

A right of way over the South 18 feet of the East three-quarters (3/4) of Lot 2 of Earlimart Colony Lands, in Section 26, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded March 16, 1908 in Book 8, Page 26 of Maps, in the office of the County Recorder of said County.

Parcel 4 is shown for conveyance purposes only, no insurance is hereby offered.

## PARCEL 5: APN: 318-340-001

The West half of the Northwest quarter of Section 36, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the South 30 feet thereof, as conveyed to the County of Tulare in deed recorded September 13, 1954 in Book 1777, Page 7 as Document No. 27099 of Official Records.

Also Excepting therefrom the North 40 feet thereof, as conveyed to the County of Tulare, in deed recorded October 25, 1961, in Book 2295, Page 19 as Document No. 33391 of Official Records.

Also Excepting therefrom an undivided one-half interest in all oil, gas and minerals in and under said land, together with the right of the grantor, its successors and assigns, and legal representatives at all times to enter on the above described lands and take all the usual necessary or convenient means to bore wells, make excavations and to remove all the oil, gas and minerals found thereon and herein reserved, as reserved by Bank of America National Trust and Savings Association, a national banking association, in deed recorded December 7, 1934 in Book 600, Page 271 of Official Records.

## PARCEL 6: APN: 318-340-004

The West 30 acres of the Northeast quarter of the Northwest quarter of Section 36, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Excepting therefrom the North 40 feet thereof, as conveyed to the County of Tulare, in deeds recorded July 19, 1961 in Book 2276, Page 418 as Document No. 22864 of Official Records, and July 27, 1961 in Book 2278, Page 184 as Document No. 23847 of Official Records.

Also Excepting therefrom, all gas, oil and other hydrocarbon substances and minerals, together with a reasonable right of ingress and egress to develop and extract the same, as excepted in the Executor's Deed executed by Burnell G. Forgey, as executor of the will of Genevieve Forgey Robinson, deceased, recorded May 4, 1964 in Book 2503, Page 391 as Document No. 16086 of Official Records.

### PARCEL 7: APN: 319-010-008

The Southwest quarter of the Northeast quarter of Section 22, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

### PARCEL 8: APN: 319-010-009

The Northwest quarter of the Northeast quarter Section 22, Township 23, South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half of all oil gas and other hydrocarbon substances within or underlying said land, as reserved by James W. Clark and Mamie S. Clark, husband and wife, as joint tenants, in deed recorded May 17, 1955 in Book 1835, Page 166 as Document No. 17695 of Official Records.

### PARCEL 9: APN: 319-010-010

The East half of the Northeast quarter of Section 22, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the right, title and interest in and to that portion of said land, described as "that portion
thereof acquired by the United States of America for the Friant-Kern Canal", as disclosed by deeds recorded January 29, 1997 as Document Nos. 97-005601 and 97-005602 of Official Records.

Also Excepting therefrom from the Northeast quarter of the Northeast quarter of said Section 22, one-half interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder, together with, all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property and also the right to drill for, produce and use water from the said real property in connection with its drilling or mining operations thereof, subject to the terms and conditions contained therein, all as reserved by Capitol Company in deed recorded June 19, 1943 in Book 1034, Page 389 of Official Records.

### PARCEL 10: APN: 319-110-009

The East half of the Northwest quarter; and the Southwest quarter of the Northwest quarter of Section 10, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Excepting therefrom an undivided one-half interest in and to all oil, and/or natural gas underlying said land, together with, the right of ingress and egress to, from said property as may or shall be reasonable or necessary to utilize this exception and reservation and/or to enjoy the benefits thereof and/or to enable exploration for and/or production of such oil and/or natural gas, as reserved by Jim Christiansen in the deed recorded January 29, 1945 in Book 1109, Page 480 of Official Records.

## PARCEL 11: APN: 319-120-010

The Northwest quarter of the Southeast quarter of Section 15, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom as to an undivided one-half interest in and to all oil, gas and minerals in, on or under said property, together with incidental rights, as reserved by Maud Louise Hilliard, also known as Maude Louisa Hilliard, in deed recorded June 20, 1955 in Book 1842, Page 160 as Document No. 21480 of Official Records.

## PARCEL 12: APN: 319-120-011

The Northeast quarter of the Southeast quarter of Section 15, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the East 40 feet thereof as conveyed to the County of Tulare, in deed recorded July 9, 1954 in Book 1764, Page 369 as Document No. 20675 of Official Records.

Also Excepting therefrom an undivided one-half interest in all minerals, oil, gas, petroleum and other hydrocarbon substances within and underlying said land, as reserved by Gordon R. Todd and Opal R. Todd, husband and wife, in deed recorded April 28, 1978 in Book 3526, Page 962 as Document No. 24201 of Official Records.

## PARCEL 13: APN: 319-120-012

The Southeast quarter of the Southeast quarter of Section 15, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom that portion thereof conveyed to the United States of America For Friant-Kern Canal purposes, in deed recorded March 31, 1948 in Book 1294, Page 596 of Official Records.

Also Excepting therefrom that portion thereof conveyed to the United States of America for Friant Kem Canal purposes, in deed recorded November 16, 1949 in Book 1399, Page 310 of Official Records.

Also Excepting therefrom the East 40 feet thereof as conveyed to the County of Tulare, in deed recorded August 6, 1954 in Book 1770, Page 115 as Document No. 23456 of Official Records.

Also Excepting therefrom that portion thereof conveyed to Saucelito Irrigation District, in deed recorded October 28, 1960 in Book 2223, Page 109 as Document No. 31972 of Official Records.

Also Excepting therefrom an undivided 5% of all minerals, oil, gas, gasoline or other hydrocarbon substances on, in and under said land as granted by Carrie M. Broaded to George D. Broaded, in the Mineral Deed recorded March 14, 1955 in Book 1819, Page 123 as Document No. 9544 of Official Records.

**PARCEL 14: APN: 319-120-014**

The Southwest quarter of the Southeast quarter Section 15, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half interest in all minerals, oil, gas petroleum and other hydrocarbon substances within or underlying said land, as reserved by George W. Wiseman, in deed recorded October 30, 1952 in Book 1629, Page 110 as Document No. 29418 of Official Records.

Also Excepting therefrom an undivided one-quarter interest in all minerals, oil, gas, petroleum and other hydrocarbon substances within and underlying said land, as reserved by Henry L. Lubking and August M. Lubking, husband and wife, in deed recorded April 28, 1978 in Book 3526, Page 959 as Document No. 24199 of Official Records.

**PARCEL 15: APN: 319-130-007, 012 and 013**
PART 1:

That portion of fractional Section 1, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof, lying West of the Westerly line of the Friant-Kern Canal right of way as granted to the United States of America, by deed recorded April 12, 1948 in Book 1289, Page 154 of Official Records.

Excepting therefrom that portion thereof granted to Saucelito Irrigation District, by deed recorded May 27, 1960 in Book 2197, Page 637 as Document No. 17083 of Official Records, described as follows:

Beginning, at the intersection of the Friant-Kern Canal center line and the South line of said Section 1; thence, North 89° 42' West for a distance of 160.8 feet; thence, North 33° 15' East for a distance of 48.9 feet to the true point of beginning; thence, North 33° 15' East for a distance of 125.0 feet; thence, North 56° 45' West for a distance of 50.0 feet; thence, South 33° 15' West for a distance of 159.6 feet; thence, North 88° 36' East for a distance of 60.8 feet to the true point of beginning.

Also Excepting the rights or interest conveyed to the County of Tulare, in deed recorded September 24, 1948 in Book 1311, Page 180 of Official Records, which deed conveys the North 40 feet of said land for the purpose of a public highway.

Also Excepting therefrom that portion thereof described as follows:

Beginning at a point in the South line of said Section 1, distant 699.60 feet East of the Southwest corner thereof, said point being the Southwest corner of the parcel of land conveyed to the United States of America for the Friant-Kern Canal right of way by deed recorded April 12, 1948 in Book 1289, Page 154 of Official Records; thence, North 00° 18' East 25 feet;

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

thence, North 88° 36' East 540.9 feet;
thence, North 33° 15' East 183.52 feet to the true point of beginning of the parcel herein to be described;
thence, North 02° 22' East 2,457.75 feet to a point in the North line of the South half of said Section 1;
thence, South 89° 31' 30" East, along said last mentioned North line, 1,542.83 feet to a point in the Easterly line of Parcel "A" of the land conveyed to George S. Maze and wife by deed recorded July 9, 1959 in Book 2135, Page 196 as Document No. 22184 of Official Records;
thence, along said Easterly line South 33° 41' West 1977.96 feet to an angle point therein;
thence, South 26° 44' West 125.9 feet;
thence, South 33° 15' West 900 feet;
thence, North 02° 22' East 68.19 feet to the true point of beginning.

Also Excepting that portion thereof described as follows:

Beginning, at a point in Southerly boundary of said Section 1, distant therealong South 89° 42' East 699.6 feet from the Southwest corner of said Section 1;

thence, along said Southerly boundary North 89° 42' West 525.0 feet;
thence, leaving said Southerly boundary North 00° 18' East 25.0 feet to a point in the Northerly boundary of the county road right of way;
thence, North 89° 29' East 1005 feet to a point in the Northwesterly boundary a certain tract of land as conveyed to the United States of America by deed recorded in Book 1289 Page 154, of Official Records, said point also being the most Southwesterly corner of that certain tract of land as conveyed to the Saucelito Irrigation District by deed dated February 5, 1960, and recorded May 27, 1960 in Book 2197, Page 637 as Document No. 17083 of Official Records;
thence, along said Northwesterly boundary as follows:
South 88° 36' West 480.1 feet;
thence, South 00° 18' West 25.0 feet to the point of beginning.

Also Excepting therefrom an undivided one-half interest in and to all oils, gas, petroleum, casinghead gas or other hydrocarbon substances, together with minerals or either or all of them situated and being or to be found or discovered in, on or under or above any portion of the above described real property, together with, the right on behalf of C.L. Crow and Mildred B. Crow, his wife, their successors, heirs or assigns, to enter into, upon, or about and above the above described real property for the purpose of exploring, drilling, mining, storing or removing the same or any part thereof from the above described real property, as reserved by C.L. Crow and Mildred B. Crow, his wife, in deed to George S. Maze and Sheila S. Maze, his wife, as community property, recorded October 3, 1956 in Book 1951, Page 24 as Document No. 30786 of Official Records, and being the same undivided one-half interest in and to said substances, as reserved by C.L. Crow and Mildred B. Crow, his wife, in the Agreement of Sale dated January 4, 1952, recorded January 17, 1952 in Book 1563, Page 289 as Document No. 1591 of Official Records.

Also Excepting therefrom an undivided one-fourth interest in and to all oil, gas, petroleum, casinghead gas or other hydrocarbon substances together with, minerals or either or all of them situated and being or to be found or discovered in, on or under or above any portion of the above described real property, together with, the right on behalf of Dean A. Pearce and Verda Lee Pearce, his wife, their successors, heirs or assigns, to enter into, upon, about and above, the above described real property, for the purposes of exploring, drilling, mining, storing or removing the same or any part thereof, from the above described real property, all as reserved by Dean A. Pearce and Verda Lee Pearce, in deed recorded October 3, 1956 in Book 1951, Page 24 as Document No. 30786 of Official Records.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Also Excepting from the South 30 acres, lying West of the Friant-Kern Canal right of way in said Section 1, all oils, gas, petroleum, casinghead gas or other hydrocarbon substances, together with, minerals or either or all of them, situated and being or to be found or discovered in, on or under a portion of the above described real property, together with, rights incidental to the development thereof, as reserved by George S. Maze and Sheila S. Maze, his wife, in the instrument entitled Declaration of Trust (deed), recorded March 1, 1957 in Book 1979, Page 720 as Document No. 7226 of Official Records.

Excepting from all of said land, except the South 30 acres thereof, seventy-five percent of the minerals, such minerals to include but not be limited to oil, gas, casinghead gas, associated hydrocarbons, coal, lignite, sulphur, phosphate, lead, zinc, copper, iron ore and other metallic ores, sodium, salt, uranium, thorium, molybdenum, vanadium, geothermal energy, titanium and other fissionable materials, gold, silver (and other precious metals), bauxite, limestone and other stones, gypsum and other minerals (sand, gravel and clay being the only exceptions) now owned or hereafter acquired by party of the first part in, on or under the real property, together with, full rights of ingress and egress and use of the surface to the extent reasonably necessary for the purpose of exploring, drilling, mining (including, to the extent reasonable in the circumstances, open pit and strip mining), developing, producing, storing, removing, treating and transporting said materials, all as reserved by The Travelers Insurance Company, in Quit Claim Deed recorded November 28, 1988 in Book 4774, Page 156, as Document No. 74413 of Official Records.

PART 2:

A strip of land lying adjacent to the Friant-Kern Canal in fractional Section 1, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof, being a portion of the 44.7 acre parcel of land described in the deed to the United States of America recorded April 12, 1948 in Book 1289, Page 154 of Official Records, said portion being described as Parcel "A" in the deed executed by the United States of America, recorded July 9, 1959 in Book 2135, Page 196 as Document No. 22184 of Official Records, described as follows:

Beginning, at a point in the Northwesterly boundary of said 44.7 acre parcel distant South 60° 23' West 45.8 feet from a point in the Easterly boundary of said Section 1, that is distant therealong South 00° 23' West 157.3 feet from the Northeast corner of said Section 1;
thence, from said point of beginning entering said 44.7 acre parcel South 67.1 feet;
thence, South 60° 38' West 746.8 feet;
thence, South 55° 17' West 329.8 feet;
thence, South 46° 00' West 819.8 feet;
thence, North 74° 36' West 69.5 feet;
thence, South 45° 39' West 70.0 feet;
thence, South 15° 24' East 69.5 feet;
thence, South 44° 49' West 342.5 feet;
thence, South 39° 41' West 228.7 feet;
thence, South 33° 41' West 2855.2 feet;
thence, South 26° 44' West 125.9 feet;
thence, South 33° 15' West 900.0 feet;
thence, North 56° 45' West 35.0 feet to the Northwesterly boundary of said 44.7 acre parcel;
thence, along said Northwesterly boundary as follows:

North 33° 15' East 1400.0 feet;
thence, North 34° 12' East 600.1 feet;

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

thence, North 32° 32' East 800.0 feet;
thence, North 33° 36' East 1080.3 feet;
thence, North 42° 08' East 235.1 feet;
thence, North 34° 09' East 1053.6 feet;
thence, South 44° 21' East 195.0 feet;
thence, North 45° 39' East 302.7 feet;
thence, North 58° 02' East 906.7 feet;
thence, North 60° 23' East 180.0 feet to the point of beginning,

Excepting therefrom that portion thereof described as follows:

Beginning at a point in the South line of said Section 1, distant 699.60 feet East of the Southwest corner thereof, said point being the Southwest corner of the parcel of land conveyed to the United States of America for the Friant-Kern Canal right of way by deed recorded April 12, 1948 in Book 1289, Page 154 of Official Records;
thence, North 00° 18" East 25 feet;
thence, North 88° 36' East 540.9 feet;
thence, North 33° 15' East 183.52 feet to the true point of beginning of the parcel herein to be described;
thence, North 02° 22' East 2,457.75 feet to a point in the North line of the South half of said Section 1;
thence, South 89° 31' 30" East, along said last mentioned North line 1,542.83 feet to a point in the Easterly line of Parcel "A" of the land conveyed to George S. Maze and wife by deed recorded July 9, 1959 in Book 2135, Page 196 as Document No. 22184 of Official Records;
thence, along said Easterly line South 33° 41' West 1,977.96 feet to an angle point therein;
thence, South 26° 44' West 125.9 feet;
thence, South 33° 15' West 900 feet;
thence, North 02° 22' East 68.19 feet to the true point of beginning.

Also Excepting therefrom seventy-five percent of the minerals, such minerals to include but not be limited to oil, gas, casinghead gas, associated hydrocarbons, coal, lignite, sulphur, phosphate, lead, zinc, copper, iron ore and other metallic ores, sodium, salt, uranium, thorium, molybdenum, vanadium, geothermal energy, titanium and other fissionable materials, gold, silver (and other precious metals), bauxite, limestone and other stones, gypsum and other minerals (sand, gravel and clay being the only exceptions) now owned or hereafter acquired by party of the first part in, on or under the real property, together with, full rights of ingress and egress and use of the surface to the extent reasonably necessary for the purpose of exploring, drilling, mining (including, to the extent reasonable in the circumstances, open pit and strip mining), developing, producing, storing, removing, treating and transporting said materials, all as reserved by The Travelers Insurance Company, in the Quit Claim Deed recorded November 28, 1988 in Book 4774, Page 156 as Document No. 74413 of Official Records.

PART 3:

That portion of the South half of fractional Section 1, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof, created in the deed recorded February 17, 1972 in Book 3017, Page 342 as Document No. 6826 of Official Records, described as follows:

Beginning at a point in the South line of said Section 1, distant 699.60 feet East of the Southwest corner thereof, said point being the Southwest corner of the parcel of land conveyed to the United States of America, for the Friant-Kern Canal right of way by deed recorded April 12, 1948 in Book 1289, Page 154 of Official Records;

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

**59**

thence, North 00° 18' East 25 feet;

thence, North 88° 36' East 540.9 feet;

thence, North 33° 15' East 183.52 feet to the true point of beginning of the parcel herein to be described;

thence, North 02° 22' East 2457.75 feet to a point in the North line of the South half of said Section 1;

thence, South 89° 31' 30" East, along said last mentioned North line, 1542.83 feet to a point in the Easterly line of Parcel "A" of the land conveyed to George S. Maze and wife, by deed recorded July 9, 1959 in Book 2135, Page 196 as Document No. 22184 of Official Records;

thence, along said Easterly line, South 33° 41' West 1977.96 feet to an angle point therein;

thence, South 26° 44' West 125.9 feet;

thence, South 33° 15' West 900 feet;

thence, North 02° 22' East 68.19 feet to the true point of beginning.

Also Excepting therefrom an undivided one-half interest in and to all oils, gas, petroleum, casinghead gas or other hydrocarbon substances, together with minerals or either or all of them situated and being or to be found or discovered in, on or under or above any portion of the above described real property, together with, the right on behalf of C.L. Crow and Mildred B. Crow, his wife, their successors, heirs or assigns, to enter into, upon, or about and above the above described real property for the purpose of exploring, drilling, mining, storing or removing the same or any part thereof from the above described real property, as reserved by C.L. Crow and Mildred B. Crow, his wife, in deed to George S. Maze and Sheila S. Maze, his wife, as community property, recorded October 3, 1956 in Book 1951, Page 24 as Document No. 30786 of Official Records, and being the same undivided one-half interest in and to said substances, as reserved by C.L. Crow and Mildred B. Crow, his wife, in the Agreement of Sale dated January 4, 1952, recorded January 17, 1952 in Book 1563, Page 289 as Document No. 1591 of Official Records.

Also Excepting therefrom all oil, gas and other hydrocarbon substances and minerals lying in, upon or under, or which may be produced, save or sold from real property, with the right of reasonable ingress and egress and all rights necessary and incidental to drilling for and removing such oil, gas and other hydrocarbon substances and minerals therefrom, and subject to all reservations of oil, gas and other hydrocarbon substances and minerals heretofore made by grantor's predecessors in title, all as reserved by S.A. Camp Ginning Company, a California corporation in the deed recorded January 16, 1970 in Book 2876, Page 391 as Document No. 1730 of Official Records.

## PARCEL 16: APN: 338-080-015

The Northwest quarter of Section 30, Township 24 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, to the Official Plat thereof.

Excepting therefrom that portion of the Northwest quarter of said Section 30 described as follows:

Beginning, at the Southwest corner of said Northwest quarter;

thence, East, along the South line of said Northwest quarter, a distance of 2654.66 feet, more or less, to the Southeast corner of said Northwest quarter;

thence, North, along the East line of said Northwest quarter, a distance of 35.0 feet;

thence, Westerly parallel to the South line of the Northwest quarter, a distance of 21.7 feet;

thence, Northerly parallel to the East line of the Northwest quarter, a distance of 4.0 feet;

thence, West 2632.96 feet, more or less, to a point on the West line of said Northwest quarter, said point being 40.0 feet North of the Southwest corner of said Northwest quarter;

thence, South 40.0 feet to the point of beginning.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

### PARCEL 17: APN: 338-080-014

Lots 6 and 8 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded June 8, 1914 in Book 15, Page 6 of Maps, in the office of the County Recorder of said County.

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

### PARCEL 18: APN: 338-080-037

Lots 2 and 4 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded June 8, 1914 in Book 15, Page 6 of Maps, in the office of the County Recorder of said County, together with, that portion of the Northwest quarter of Section 30, Township 24 South, Range 26 East, Mount Diablo Base and Meridian, in the County of Tulare, State of California, according to the Official Plat thereof described as follows:

Beginning, at the Southwest corner of said Northwest quarter;
thence, East, along the South line of said Northwest quarter, a distance of 2654.66 feet, more or less, to the Southeast corner of said Northwest quarter;
thence, North, along the East line of said Northwest quarter, a distance of 35.0 feet;
thence, Westerly parallel to the South line of the Northwest quarter, a distance of 21.7 feet;
thence, Northerly parallel to the East line of the Northwest quarter, a distance of 4.0 feet;
thence, West 2632.96 feet, more or less, to a point on the West line of said Northwest quarter, said point being 40.0 feet North of the Southwest corner of said Northwest quarter;
thence, South 40.0 feet to the point of beginning,

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons

in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

### PARCEL 19: APN: 338-080-038

Lots 1 and 3 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded June 8, 1914 in Book 15, Page 6 of Maps, in the office of the County Recorder of said County.

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

Also Excepting therefrom an undivided one-fourth interest of the fifty percent defined therein in all oil, gas, minerals and other hydrocarbon substances in, upon or under Lots 1 and 3 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, or any portion thereof and the right to prospect for the same and to drill for and to produce and take away the same together with the night at all times to enter upon said lands for the abovementioned purposes with due regard to the use of the same by the grantees, their heirs, successors or assigns, as reserved by Kosta James Hronis, a married man as his sole and separate property, and Peter John Hronis, a married man as his sole and separate property, formerly as joint tenants now as tenants in common, in Quitclaim Deed recorded November 7, 2016 as Document No. 2016-0070603 of Official Records.

Also Excepting therefrom an undivided one-fourth interest of the fifty percent defined therein in all oil, gas, minerals and other hydrocarbon substances in, upon or under Lots 1 and 3 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, or any portion thereof and the right to prospect for the same and to drill for and to produce and take away the same together with the night at all times to enter upon said lands for the abovementioned purposes with due regard to the use of the same by the grantees, their heirs, successors or assigns, as reserved by Hronis Capital Management, LLC, in Quitclaim Deed recorded November 7, 2016 as Document No. 2016-0070604 of Official Records.

### PARCEL 20: APN: 338-080-039

Lots 5 and 7 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded June 8, 1914 in Book 15, Page 6 of Maps, in the office of the County Recorder of said County.

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

## PARCEL 21A: INTENTIONALLY DELETED

## PARCEL 21B: INTENTIONALLY DELETED

## PARCEL 21C: INTENTIONALLY DELETED

## PARCEL 22: APN: 339-140-002

The Northwest quarter of the Northwest quarter of the Northwest quarter of Section 27, and that portion of the North half of Section 27, Township 24 South, Range 27 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof, described as follows:

Beginning at the Northeast corner of the Northwest quarter of the Northwest quarter of the Northwest quarter of said Section 27; thence, South along the East line of the West half of the West half of the Northwest quarter of said Section 27, 1390.4 feet;
thence, East parallel with the North line of said Section 27, 2978.45 feet;
thence, North 1390.4 feet to the North line of said Section 27;
thence, West along said North line, 990 feet to the Northeast corner of the Northwest quarter of said Section 27;
thence, continuing West along said North line 1988 45 feet to the place of beginning.

Excepting therefrom the West 55 feet of the Northwest quarter of the Northwest quarter of the Northwest quarter, as conveyed to the State of California, in deed recorded April 28, 1945 in Book 1121, Page 248 of Official Records.

Also Excepting therefrom all oil, gas, minerals, geothermal and other hydrocarbon substances in and under said land, as reserved by Treecrop Company, a limited partnership in the deed recorded April 27, 1979 in Book 3647,Page 97 as Document No. 24614 of Official Records.

## PARCEL 23-54: INTENTIONALLY DELETED.

## TRACT B

## THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

## PARCEL 1-29: INTENTIONALLY DELETED

## PARCEL 30: APN: 320-200-074-000:

PARCEL 1 OF PARCEL MAP NO. PPM 14-050, IN THE UNINCORPORATED AREA OF THE COUNTY OF TULARE, STATE OF CALIFORNIA ACCORDING TO RESOLUTION 9058,

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

63

RECORDED MAY 5, 2015, AS DOCUMENT NO. 2015-0023758, OF OFFICIAL RECORDS, AND DESCRIBED AS FOLLOWS:

THAT PORTION OF THE SOUTHWEST QUARTER OF FRACTIONAL SECTION 2, TOWNSHIP 23 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING, AT THE SOUTHEAST CORNER OF THE WEST HALF OF THE WEST HALF OF SAID SOUTHWEST QUARTER;
THENCE, NORTH 0°32'10" EAST 1272.30 FEET ALONG THE EAST LINE OF SAID WEST HALF OF THE WEST HALF OF SAID SOUTHWEST QUARTER;
THENCE, SOUTH 89°22'59" EAST 969.20 FEET;
THENCE, SOUTH 00°29'44" WEST 1268.10 FEET TO THE SOUTH LINE OF SAID SOUTHWEST QUARTER;
THENCE, SOUTH 89°37'52" EAST 970.10 FEET TO THE POINT OF BEGINNING.

### PARCEL 31: INTENTIONALLY DELETED

### PARCEL 32: INTENTIONALLY DELETED


### TRACT C

**THE LAND REFERRED TO HEREIN BELOW IS SITUATED UNINCORPORATED AREA OF TULARE, COUNTY OF TULARE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:**

### PARCEL 1-7: INTENTIONALLY DELETED

### PARCEL 8: APN: 320-230-033-000:

PARCEL 1 OF RECORD OF SURVEYS OF LOTS 88 AND 97 OF TERRA BELLA LANDS, SUBDIVISION NO. 5, IN THE UNINCORPORATED AREA OF THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED JANUARY 26, 1960, IN BOOK 9, PAGE 55 OF LICENSED SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. SAID TERRA BELLA LANDS, SUBDIVISION NO. 5 RECORDED IN VOLUME 8, PAGE 15 OF MAPS.

### PARCEL 9: APN: 320-230-082-000:

PARCEL 1 OF LOT LINE ADJUSTMENT MAP NO. PLA 10-015, IN THE UNINCORPORATED AREA OF THE COUNTY OF TULARE, STATE OF CALIFORNIA ACCORDING TO THE INSTRUMENT RECORDED DECEMBER 1, 2011, AS DOCUMENT NO. 2011-0074944, OF OFFICIAL RECORDS, DESCRIBED AS FOLLOWS:

PARCEL 2 OF PARCEL MAP NO. 2539 PER MAP RECORDED IN BOOK 26, PAGE 40 OF PARCEL MAPS IN THE OFFICE OF THE COUNTY RECORDER, COUNTY OF TULARE, STATE OF CALIFORNIA AND PARCEL 3 OF RECORD OF SURVEY PER MAP RECORDED IN BOOK 9,

PAGE 55 OF LICENSED SURVEYS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM, THE SOUTH 167.00 FEET OF SAID PARCEL 3

**PARCEL 10A: APN: 339-110-007 PORTION**

THE SOUTH 40 ACRES OF THE SOUTHWEST QUARTER; AND THE WEST 990 FEET OF THE SOUTH 40 ACRES OF THE SOUTHEAST QUARTER OF SAID SECTION 22, TOWNSHIP 24 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE WEST 55 FEET THEREOF, AS CONVEYED TO THE STATE OF CALIFORNIA, IN DEED RECORDED APRIL 28, 1945 IN BOOK 1121, PAGE 248 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, GEOTHERMAL AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY TREECROP COMPANY, A LIMITED PARTNERSHIP IN THE DEED RECORDED APRIL 27, 1979 IN BOOK 3647, PAGE 97 AS DOCUMENT NO. 24614 OF OFFICIAL RECORDS.

**PARCEL 10B: APN: 339-110-007 PORTION**

LOTS 20, 27, 28, AND 37 OF G.A. HART'S SUBDIVISION NO 1, IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED JULY 3, 1912 IN BOOK 12, PAGE 1 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THE WEST 30 FEET OF SAID LOTS 20, 28, AND 37, AS CONVEYED TO THE STATE OF CALIFORNIA, IN THE FINAL ORDER OF CONDEMNATION, RECORDED JUNE 21, 1945 IN BOOK 1128, PAGE 103 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, GEOTHERMAL AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY TREECROP COMPANY, A LIMITED PARTNERSHIP IN THE DEED RECORDED APRIL 27, 1979 IN BOOK 3647, PAGE 97 AS DOCUMENT NO. 24614 OF OFFICIAL RECORDS.

**PARCEL 10C: APN: 339-110-007 PORTION**

THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 22, TOWNSHIP 24 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE WEST 55 FEET THEREOF, AS CONVEYED TO THE STATE OF CALIFORNIA, IN THE FINAL ORDER OF CONDEMNATION, RECORDED JUNE 21, 1945 IN BOOK 1128, PAGE 103 OF OFFICIAL RECORDS.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

ALSO EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, GEOTHERMAL AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY TREECROP COMPANY, A LIMITED PARTNERSHIP IN THE DEED RECORDED APRIL 27, 1979 IN BOOK 3647, PAGE 97 AS DOCUMENT NO. 24614 OF OFFICIAL RECORDS.

### PARCEL 11: APN: 339-140-002

THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 27, AND THAT PORTION OF THE NORTH HALF OF SECTION 27, TOWNSHIP 24 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 27; THENCE, SOUTH ALONG THE EAST LINE OF THE WEST HALF OF THE WEST HALF OF THE NORTHWEST QUARTER OF SAID SECTION 27, 1390.4 FEET; THENCE, EAST PARALLEL WITH THE NORTH LINE OF SAID SECTION 27, 2978.45 FEET; THENCE, NORTH 1390.4 FEET TO THE NORTH LINE OF SAID SECTION 27; THENCE, WEST ALONG SAID NORTH LINE, 990 FEET TO THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SAID SECTION 27; THENCE, CONTINUING WEST ALONG SAID NORTH LINE 1988 45 FEET TO THE PLACE OF BEGINNING.

EXCEPTING THEREFROM THE WEST 55 FEET OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER, AS CONVEYED TO THE STATE OF CALIFORNIA, IN DEED RECORDED APRIL 28, 1945 IN BOOK 1121, PAGE 248 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, GEOTHERMAL AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY TREECROP COMPANY, A LIMITED PARTNERSHIP IN THE DEED RECORDED APRIL 27, 1979 IN BOOK 3647, PAGE 97 AS DOCUMENT NO. 24614 OF OFFICIAL RECORDS.

=

**THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA OF KERN, COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:**

**TRACT A**

**PARCEL 1-22: INTENTIONALLY DELETED.**

**PARCEL 23: APN: 049-020-06-01**

The West half of the Northwest quarter of fractional Section 3, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half of all oil, gas, hydrocarbons, and other mineral rights, as reserved by L.R. Billings, as Executor of the Will of Elmer W. Harris, deceased, in deed recorded November 5, 1958 in Book 3031, Page 64 as Document No. 61974 of Official Records.

Also Excepting therefrom an undivided one-fourth of all the oil, gas, hydrocarbons and other minerals, as reserved by Elva Dau Say who acquired title as Elva Dau, in deed recorded December 29, 1977 in Book 5078, Page 557 as Document No. 60741 of Official Records.

**PARCEL 24: APN: 049-020-18**

The East half of Section 4, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom the South 2377.00 feet thereof.

Also Excepting therefrom all that portion lying within the land described in Parcel One in the deed to The United States of America, recorded June 29, 1950 in Book 1689, Page 374 as Document No. 26906 of Official Records, described as follows:

Beginning, at the North quarter corner of said Section 4 and running thence along the Northerly boundary of said Section 4, South 89° 58' East 354.8 feet;
thence, leaving said boundary and running South 00° 03' East 1546.7 feet;
thence, South 01° 23' West 1000.3 feet;
thence, South 00° 31' West 1000.1 feet;
thence, South 01° 52' West 600.3 feet;
thence, South 00° 26' West 600.00 feet;
thence, South 03° 41' West 536.1 feet;
thence, South 00° 03' East 33.7 feet to a point in the Southerly boundary of said Section 4, distant there along South 89° 57' East 258.3 feet from the South quarter corner of said Section 4; thence running along said Southerly boundary North 89° 57' West 258.3 feet to the South quarter corner of said Section 4;

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

thence, running along the West boundary of the East half of said Section 4 North 00° West 5315.3 feet to the point of beginning.

Also Excepting therefrom all oil, gas and minerals in said land, and the right to drill for, mine and remove the same, together with such rights to the use of the surface and rights of ingress and egress as may be necessary to drill for, mine and remove the same, as reserved by Di Giorgio Fruit Corporation, a Delaware corporation, in deed recorded March 31, 1944 in Book 1187, Page 109 of Official Records.

## PARCEL 25: APN: 049-020-19

The South 2377.00 feet of the East half of Section 4, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom all that portion lying within the land described in Parcel One and Parcel Two, in deed to The United States of America, recorded June 29, 1950 in Book 1689, Page 374 as Document No. 26906 of Official Records, described as follows:

"Parcel One":
Beginning at the North quarter corner of said Section 4 and running thence along the Northerly boundary of said Section 4, South 89° 58' East 354.8 feet;
thence, leaving said boundary and running South 00° 03' East 1546.7 feet;
thence, South 01° 23' West 1000.3 feet;
thence, South 00° 31' West 1000.1 feet;
thence, South 01° 52' West 600.3 feet;
thence, South 00° 26' West 600.00 feet;
thence, South 03° 41' West 536.1 feet;
thence, South 00° 03' East 33.7 feet to a point in the Southerly boundary of said Section 4, distant there along South 89° 57' East 258.3 feet from the South quarter corner of said Section 4; thence running along said Southerly boundary North 89° 57' West 258.3 feet to the South quarter corner of said Section 4; thence, running along the West boundary of the East half of said Section 4 North 00° West 5315.3 feet to the point of beginning.

"Parcel Two":
Beginning at a point in the Southerly boundary of said Section 4, distant there along South 89° 57' East 258.3 feet from the South quarter corner of said Section 4;
thence, running along the Easterly boundary of said Parcel 1 North 00° 03' West 33.7 feet;
thence, leaving said boundary and running South 89° 32' East 513.0 feet;
thence, South 00° 03' West 30.0 feet to a point in the Southerly boundary of said Section 4 distant therealong South 89° 57' East 771.3 feet from the South quarter corner of said Section 4;
thence, running along said Southerly boundary North 89° 57' West 513.0 feet to the point of beginning

Also Excepting therefrom all oil, gas and minerals in said land, and the right to drill for, mine and remove the same, together with such rights to the use of the surface and rights of ingress and egress as may be necessary to drill for, mine and remove the same, as reserved by Di Giorgio Fruit Corporation, a Delaware corporation, in deed recorded March 31, 1944 in Book 1187, Page 109 of Official Records.

## PARCEL 26: APN: 049-240-01-01

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

The Northwest quarter of the Northwest quarter of Section 15, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half of all oil, gas, gasoline, casinghead gas and/or other hydrocarbon substances and/or minerals in and under said land, as reserved by Charles O. LaRue and Violet LaRue, husband and wife, in deed recorded December 19, 1941 in Book 1073, Page 426 of Official Records.

## PARCEL 27: APN: 049-240-02-01

The Northeast quarter of the Northwest quarter of Section 15, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half of all oil, gas and minerals in and under said land, as excepted by W.J. Wallace and Company, a corporation, in deed recorded December 2, 1941 in Book 1065, Page 212 of Official Records, and as ratified and confirmed by the deed recorded April 27, 1942 in Book 1082, Page 256 of Official Records.

PARCEL 28A: APN: 050-130-06 PORTION

Lots 5 and 8 of Hollywood Tract, in the unincorporated area, County of Kern, State of California, according to the map thereof recorded June 12, 1909 in Book 1, Page 113, of Maps, in the office of the County Recorder of said County.

Excepting therefrom that portion of said Lot 5, described as follows:
Beginning at the Northeast corner of said Lot 5;
thence, South along the East line of said Lot 5, a distance of 533 feet and the true point of beginning of this description;
thence, West at right angles to the East line, a distance of 130 feet;
thence, South and parallel to the East line of said Lot 5, a distance of 115 feet;
thence, East to the East line of said Lot 5;
thence, North along the East line of said Lot 5, a distance of 115 feet and the true point of beginning.

Also Excepting therefrom an undivided one-half of all minerals, oil, gas and other hydrocarbon substances within or underlying said land, as excepted by Philip Stone Briggs and Gertie Leona Briggs, husband and wife, in deed recorded February 9, 1966 in Book 3917, Page 488 as Document No. 07052 of Official Records.

## PARCEL 28B: APN: 050-130-06 portion

That portion of Lot 5 of Hollywood Tract, in the unincorporated, County of Kern, State of California, according to the map thereof recorded June 12, 1909 in Book 1, Page 113, of Maps, in the office of the County Recorder of said County, described as follows:

Beginning at the Northeast corner of said Lot 5;
thence, South along the East line of said Lot 5, a distance of 533 feet and the true point of beginning of this description;
thence, West at right angles to the East line, a distance of 130 feet;

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

thence, South and parallel to the East line of said Lot 5, a distance of 115 feet;

thence, East to the East line of said Lot 5;

thence, North along the East line of said Lot 5, a distance of 115 feet and the true point of beginning.

Excepting therefrom an undivided one-half of all minerals, oil, gas and other hydrocarbon substances within or underlying said land, as excepted in the deed executed by Philip Stone Briggs and Gertie Leona Briggs, husband and wife, recorded February 9, 1966, in Book 3917, Page 490 as Document No. 07053 of Official Records.

### PARCEL 29: APN: 051-110-29

The Northeast quarter of Section 21, Township 25 South, Range 27 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half of all minerals and mineral rights of every kind and character (except water and water rights) now known to exist or hereafter discovered, including without limiting the generality of the foregoing oil, gas and rights thereto, together with the sole, exclusive and perpetual right to explore for, remove and dispose of said minerals by any means or methods suitable to grantor, its successors and assigns, but without entering upon or using the surface of said land herein described or any portion of the subsurface within 500 feet of the surface of said land, as reserved by Ernest Gaillard, Jr. and Mignonne Nash Gaillard, husband and wife, as joint tenants, in deed recorded December 31, 1981 in Book 5428, Page 1002 as Document No. 063620 of Official Records.

### PARCEL 30: INTENTIONALLY DELETED

### PARCEL 31: INTENTIONALLY DELETED

### PARCEL 32: APN: 178-190-04

The North half of the Southeast quarter of Section 26, Township 30 South, Range 29 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom, an undivided two-twenty-fifths (2/25ths) of all minerals, mineral deposits, oil, gas, natural gases, and any other hydrocarbon substances, in, to, being and lying under said land, as conveyed to H.E. Schmidt, in deed recorded April 17, 1937, in Book 715, Page 374 of Official Records.

Also Excepting therefrom all minerals, mineral deposits, oil, gas, natural gases and other hydrocarbon substances in, to, being and lying under said land, as reserved by Violante Weichelt, Trustor and Trustee under that Declaration of Trust dated April 17, 1968, in the deed recorded September 22, 1976 in Book 4979, Page 1657 as Document No. 23989 of Official Records.

### PARCEL 33: APN: 189-390-08, 09, 10, 11 & 12

Parcels 8, 9, 10, 11, and 12 of Parcel Map No. 6680, in the unincorporated area, County of Kern, State of California, according to the map recorded May 20, 1983 in Book 29, Pages 123 & 124 of Parcel Maps, in the office of the County Recorder of said County.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Excepting therefrom an undivided one-half interest in all oil, gas and other hydrocarbon substances and all other minerals and related substances contained within or underlying said land, lying below a plane 500 feet below and parallel to the surface thereof, grantor shall have no right to enter upon the surface or the area lying between the surface and the plane 500 feet below, or any part thereof, in connection with prospecting for or exploitation of said reserved minerals or for any other purpose, as reserved by Di Giorgio Corporation, a Delaware corporation, formerly Di Giorgio Fruit Corporation, a corporation, successor to Earl Fruit Company, in deed recorded April 16, 1969 in Book 4268, Page 148 as Document No. 25261 of Official Records.

Also Excepting therefrom the undivided interest(s) in and to all oil, gas, minerals and other hydrocarbon substances and mineral rights and interest, as reserved and conveyed in the deed executed by R. and B. Ranches, a partnership and Roberts Farms, Inc., in deed recorded January 13, 1978 in Book 5082, Page 396 as Document No. 3760 of Official Records.

### PARCEL 34: APN: 193-120-04-01

The Southeast quarter of Section 25, Township 31 South, Range 29 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom 29.86112% of 100% of all oil, mineral, gas and other hydrocarbon substances thereunder, as reserved unto the heirs or devisees of Harold Evans Woodworth, in the Co-Executors' Deed recorded March 21, 1972 in Book 4654, Page 927 as Document No. 25139 of Official Records.

Also Excepting therefrom 20.13888% of 100% of all oil, mineral, gas and other hydrocarbon substances thereunder, as reserved by Mamie Barlow Woodworth and Bank of America National Trust and Savings Association, a national banking association, as co-executors of the estate of Julia L. Barlow, deceased, in the Co-Executors' Deed recorded March 21, 1972 in Book 4654, Page 930 as Document No. 25140 of Official Records.

### PARCEL 35: INTENTIONALLY DELETED

### PARCEL 36: APN: 050-010-01

The West half of the Northwest quarter of Section 23, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California according to the Official Plat thereof.

### PARCEL 37: APN: 050-030-25

Lot 'A' of Lot Line Adjustment No. 61-08, recorded March 31, 2010 as Document No. 0210042563 of Official Records, being a portion of the North half of Section 23, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, being more particularly described as follows:

All that portion of Parcel 3 of Document No. 0197071338 of Official Records, together with Document No. 0200034167 of Official Records, recorded in the office of the Kern County Recorder.

Excepting therefrom the following described portion:

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Commencing at the Southeast corner of said Document No. 0200034167 of Official Records; thence Westerly along the South line of said document and the South line of the North half of said section, North 89° 34' 54" West a distance of 227.65 feet; thence parallel to the East line of said document and the centerline of Southern Pacific Railroad, North 27° 23' 30" East a distance of 1073.38 feet; thence South 89° 34' 54" East parallel to the South line of said document and the North line of said North half, a distance of 227.65 feet to the East line of said document and the centerline of Southern Pacific Railroad; thence South 27° 23' 30" West along the Easterly line of said document and the centerline of said railroad, a distance of 1073.38 feet to the Southeast corner of said document and the true point of beginning.

Excepting from that portion of said land lying Westerly of the line which is parallel to and distant 220 feet measured at right angles, Westerly from the centerline of the Southern Pacific Railroad, one-fourth of all the oil, gas and other hydrocarbon substances in, upon or under said premises or any portion thereof and the right of the grantor, his heirs, successors and assigns, the right to enter upon said premises for the above mentioned purposes from time to time with due regard to the use of the same by grantee, as reserved by William C. McCowan, a single man, in deed recorded March 4, 1949 in Book 1595, Page 221 of Official Records, and by correction deed recorded September 8, 1950 in Book 1726, Page 234 as Document No. 37383 of Official Records.

Excepting from that portion of said land lying Easterly of the line which is parallel to and distant 220 feet measured at right angles, Westerly from the centerline of the Southern Pacific Railroad, all minerals and all mineral rights of every kind and character now known to exist or hereafter discovered underlying the property, including, without limiting the generality of the foregoing, oil and gas and rights thereto, together with the sole, exclusive and perpetual right to explore for, remove and dispose of said minerals by any means or methods suitable to grantor, its successors and assigns, but without entering upon or using the surface of the property, and in such manner as not to damage the surface of the property, or to interfere with the use thereof by grantee, its successors or assigns, as reserved by Union Pacific Railroad Company, a Delaware corporation, grantor, formerly known as Southern Pacific Transportation Company, a Delaware corporation, in the quitclaim deed recorded March 24, 2000 as Document No. 0200034167 of Official Records.

### PARCEL 38: APN: 050-110-07

The East half of the Northeast quarter of Section 22, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom all the oil, gas and other hydrocarbon substances lying in, upon, or under said land or which may be produced or sold therefrom together with, the right of egress or ingress and all other rights and privileges necessary to explore for and produce oil, gas, or other hydrocarbon substances from said land, as reserved by Alex F. Kochergen and Anna Kochergen, his wife, in deed recorded January 30, 1945 in Book 1229, Page 163 of Official Records.

Also Excepting therefrom such portions as are included in public roads as reserved in the deed from Title Guarantee and Trust Company, recorded August 1, 1940 in Book 943, Pages 261 & 262 of Official Records.

### PARCEL 39: APN: 050-130-12

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

**72**

The West half of the Northeast quarter of Section 20, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-third interest in and to all oil, mineral, gas and other hydrocarbon substances below a depth of 500 feet under said land, without the right of surface entry, as excepted and reserved by Millicent L. d'Usseau, as Administratrix with will annexed of the estate of Marcella Mullaney Weiner, deceased, in deed recorded August 27, 1973 in Book 4801, Page 975 as Document No. 15303 of Official Records.

Also Excepting therefrom an undivided one-sixth interest in and to all oil, mineral, gas and other hydrocarbon substances below a depth of 500 feet under said land, without the right of surface entry, as reserved by Marie Hitchcock, who acquired title as Marie E. Mullaney, in deed recorded August 27, 1973 in Book 4801, Page 977 as Document No. 15304 of Official Records.

Also Excepting therefrom all remaining oil, gas, hydrocarbon and other minerals in and under said land and which may be produced therefrom, together with the right to enter upon said land for the above mentioned purposes from time to time with due regard to the use of the same by grantee, as reserved by Francis Christian Tudor, a married man who acquired title showing no marital status, in deed recorded January 2, 2008 as Document No. 0208000071 of Official Records.

### PARCEL 40: APN: 050-130-13

The Northwest quarter of the Northeast quarter of the Northeast quarter of Section 20, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom all remaining oil, gas, hydrocarbon and other minerals in and under said land and which may be produced therefrom, together with the right to enter upon said land for the above mentioned purposes from time to time with due regard to the use of the same by grantee, as reserved by Francis Christian Tudor, a married man who acquired title showing no marital status, in deed recorded January 2, 2008 as Document No. 0208000071 of Official Records.

### PARCEL 41: APN: 050-130-14

The Northeast quarter of the Northeast quarter of the Northeast quarter of Section 20, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half interest in all oil, gas, minerals and other hydrocarbon substances within or underlying said land as reserved by Central Farms, a California corporation in the deed recorded May 22, 1973, in Book 4786, Page 580 as Document No. 37160 of Official Records.

Also Excepting therefrom all remaining oil, gas, hydrocarbon and other minerals in and under said land and which may be produced therefrom, together with the right to enter upon said land for the above mentioned purposes from time to time with due regard to the use of the same by grantee, as reserved by Francis Christian Tudor, a married man who acquired title showing no marital status, in deed recorded January 2, 2008 as Document No. 0208000071 of Official Records.

### PARCEL 42: APN: 050-130-15

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

The Southwest quarter of the Northeast quarter of the Northeast quarter of Section 20, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half interest in all oil, gas, minerals and other hydrocarbon substances within or underlying said land as reserved by Central Farms, a California corporation in the deed recorded May 22, 1973, in Book 4786, Page 580 as Document No. 37160 of Official Records.

Also Excepting therefrom all remaining oil, gas, hydrocarbon and other minerals in and under said land and which may be produced therefrom, together with the right to enter upon said land for the above mentioned purposes from time to time with due regard to the use of the same by grantee, as reserved by Francis Christian Tudor, a married man who acquired title showing no marital status, in deed recorded January 2, 2008 as Document No. 0208000071 of Official Records.

### PARCEL 43: APN: 050-130-16

The Southeast quarter of the Northeast quarter of the Northeast quarter and the Southeast quarter of the Northeast quarter of Section 20, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom the East 25 feet thereof reserved for road purposes.

Also Excepting therefrom an undivided one-half of all oil, gas, minerals and other hydrocarbon substances, in, upon or under said premises or any portion thereof and the right to prospect for the same and to drill for and to produce and take away the same and likewise reserving unto him and to his heirs, successors and assigns the right to enter upon said premises for the abovementioned purposes from time to time with due regard to the use of the same by the grantee, as reserved by Earl K. Thomas Enterprises, a co-partnership in the deed recorded April 16, 1963 in Book 3597, Page 335 as Document No. 24579 of Official Records.

Also Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances, in, upon or under said premises or any portion thereof and the right to prospect for the same and to drill for and to produce and take away the same and likewise reserving unto them and to their heirs, successors and assigns the right to enter upon said premises for the above mentioned purposes from time to time with due regard to the use of the same by the grantee, as reserved by D. George Billings and Maryann Billings, husband and wife, D. George Billings aka D. Billings in deed recorded April 24, 1973 in Book 4781, Page 1562 as Document No. 29358 of Official Records.

Also Excepting therefrom all remaining oil, gas, hydrocarbon and other minerals in and under said land and which may be produced therefrom, together with the right to enter upon said land for the above mentioned purposes from time to time with due regard to the use of the same by grantee, as reserved by Francis Christian Tudor, a married man who acquired title showing no marital status, in deed recorded January 2, 2008 as Document No. 0208000071 of Official Records.

### PARCEL 44: APN: 049-032-04

The South half of the Northeast quarter of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Excepting therefrom that portion described as follows:

Commencing at the Northwest corner of the South half of the Northeast quarter of the Northeast quarter of said Section 5; thence South along the West line of the South half of the Northeast quarter of the Northeast quarter a distance of 679.0 feet to the southwest corner of the Northeast quarter of the Northeast quarter; thence East 10.0 feet along the South line of the Northeast quarter of the Northeast quarter; thence North parallel to the West line of the South half of the Northeast quarter of the Northeast quarter a distance of 679.0 feet to a point on the North line of the South half of the Northeast quarter of the Northeast quarter; thence 10.0 feet West to the point of beginning.

Also Excepting therefrom an undivided one-half of all oil, gas, minerals and other hydrocarbon substances, in, upon or under said premises or any portion thereof and the right to prospect for the same and to drill for and to produce and take away the same and likewise reserving unto her and to her heirs, successors and assigns the right to enter upon said premises for the above mentioned purposes as reserved by Irene Stradley Nevis, a widow in deed recorded April 3, 1967 in Book 4040, Page 45 as Document No. 16850 of Official Records.

### PARCEL 45:

An easement for a water line over that portion of the North half of the Northeast quarter of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, as shown on the Miscellaneous Survey Plat of said Section 5 by A.E. Stegeman dated January 21 and 22, 1913 on file in the Kern County Surveyor's Office, lying 5 feet on each side of the following described centerline; commencing at the Northeast corner of said section; thence West along the North line of said Section 5, a distance of 645.12 feet; thence South, at right angles, to said North line, a distance of 46.72 feet to the true point of beginning; thence North 00° 05' 37" East, a distance of 27.08 feet; thence South 87° 47' 44" East, a distance of 258.04 feet; thence South 01° 39' 23" East, a distance of 642.63 feet; thence 89°43' 55" East, a distance of 263.50 feet; thence South 00° 01° East, a distance of 3.4 feet, more or less, to the South line of said North half.

Excepting that portion lying within the North 30 feet of said section.

### PARCEL 46:

An undivided 1/3 interest in an easement for a well site over that portion of the North half of the Northeast quarter of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, as shown on the Miscellaneous Survey Plat of said Section 5 by A.E. Stegeman, dated January 21 and 22, 1913 on file in the Kern County Surveyor's Office, being more particularly described as follows:

Commencing at the Northeast corner of said Section 5; thence West, along the North line of said Section 5, a distance of 645.12 feet; thence South, at right angles, to said North line, a distance of 30.00 feet to the true point of beginning; thence East a distance of 25.00 feet; thence South a distance of 50.00 feet; thence West a distance of 50.00 feet; thence North a distance of 50.00 feet to a point on the South right of way line of road, as shown on said survey plat; thence East, along said South right of way line, a distance of 25.00 feet to the true point of beginning.

### PARCEL 47: APN 049-032-02

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

75

That portion of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, more particularly described as follows:

The Northwest quarter of the Northeast quarter of said Section 5;
excepting therefrom;
beginning at the Northeast corner of the Northwest quarter of the Northeast quarter of said Section 5;
(1) thence West along the North line of said Section 5, a distance of 10.0 feet;
(2) thence South parallel with the East line of said Northwest quarter of the Northeast quarter, a distance of 1358.0 feet to the South line of said Northwest quarter of the Northeast quarter;
(3) thence East along said South line, a distance of 10.0 feet to the Southeast corner of said Northwest quarter of the Northeast quarter;
(4) thence North along the East line of said Northwest quarter of the Northeast quarter, a distance of 1358.0 feet to the point of beginning.

The above described exception being that portion of land described in the grant deed recorded September 25, 1962 in Book 3531, Page 349 as Document No. 56451 of Official Records, in the office of the Kern County Recorder, lying within the Northwest quarter of the Northeast quarter of said Section 5.

Pursuant to Certificate of Compliance No. 2490, recorded September 13, 2011 as Document No. 000211119204 of Official Records.

### PARCEL 48: APN 049-032-08

The North half of the Southeast quarter of the Northeast quarter and the Southeast quarter of the Southeast quarter of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, as per the Official Plat thereof on file in the office of the Surveyor General.

Excepting therefrom that portion thereof comprised of the following described parcels:

PARCEL A:

The West 20 feet of the North half of the Southeast quarter of the Northeast quarter of said section.

PARCEL B:

That portion of the Southeast quarter of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, as per map thereof in the Bureau of Land Management, at the date of issuance of the Patent thereof, described as follows:

Beginning at the Southeast corner of said Southeast quarter of the Northeast quarter of Section 5; thence South 89° 49' 30" West, along the South line of said Southeast quarter of the Northeast quarter of Section 5, a distance of 660.44 feet to the Southeast corner of the Southwest quarter of the Southeast quarter of the Northeast quarter of said Section 5; thence North 00° 00' 41" East 660.24 feet to the Northeast corner of said Southwest quarter of the Southeast quarter of the Northeast quarter of said Section 5; thence South 89° 49' 14" West, along the North line of said Southwest quarter of the Southeast quarter of the Northeast quarter of said Section 5, a distance of 640.38 feet, more or less, to a point which is North 89° 49' 14"

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

**76**

East 20.00 feet of the Northwest corner of said Southwest quarter of the Southeast quarter of the Northeast quarter of said Section 5; thence North 00° 01' East 20 feet East of and parallel to the West line of said Southeast quarter of the Northeast quarter of Section 5, a distance of 180.30 feet; thence North 89° 47' East 1300.64 feet to a point on the East line of said Southeast quarter of the Northeast quarter of Section 5; thence South 841.44 feet, more or less, to the point of beginning, subject to rights of ways of 30 feet in width, along the East and South lines of said Southeast quarter of the Northeast quarter of Section 5.

Excepting therefrom all right, title and interest of, in and to all minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, together with the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain, and remove all structures, fixtures, improvements, pipelines and other facilities which may be necessary or useful for any of such purposes, provided that upon the exercise of any of the rights provided herein, the then owner of the surface, his heirs, assigns or successors in interest, shall be fully indemnified by the person exercising such rights for any and all damages or less resulting therefrom, as conveyed to the Earl Fruit Company in deed recorded April 3, 1962 in Book 3478, Page 616 as Document No. 20013 of Official Records.

### PARCEL 49: APN: 049-032-06 and 049-032-07

The South half of the Northwest quarter and the Southwest quarter of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, as per the Official Plat thereof on file in the office of the Surveyor General.

Excepting therefrom a parcel of land situated in Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, more particularly described as 10 feet wide, East and West, and 140 feet long, North and South, whose North line and East line are coincidental with the North line and the East line of the North half of the Southwest quarter of the Northeast quarter of said Section 5.

Also Excepting therefrom all right, title and interest in and to all minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, together with the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain, and remove all structures, fixtures, improvements, pipelines and other facilities which may be necessary or useful for any of such purposes, provided that upon the exercise of any of the rights provided herein, the then owner of the surface, his heirs, assigns, or successors in interest, shall be fully indemnified by the person exercising such rights for any and all damages or loss resulting therefrom, as reserved By Di Giorgio Corporation, a Delaware corporation, in deed recorded December 29, 1967 in Book 4116, Page 195 as Document No. 67741 of Official Records.

Together with that portion of County Road No. 1203, known as Bassett Avenue, as vacated by Resolution No. 2005-091, of the Board of Supervisors of the County of Kern, recorded February 14, 2018 as Document No. 218017195 of Official Records, which would further pass by operation of law.

### PARCEL 50: APN: 050-030-03

That portion of Blocks 5, 12, C, and N of Subdivision No. 1 of the Townsite of Jasmine, according to the map thereof recorded January 9, 1912 in Book 2, Page 40 of Maps, and a portion of the West half of the

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Northeast quarter of Section 23, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, in the unincorporated area, County of Kern, State of California, described as follows:

Beginning at a point in the Easterly line of said West half of the Northeast quarter of said Section 23, lying North 00° 13' 06" West 30 feet from the Southeast corner of said West half of the Northeast quarter; thence continuing along said Easterly line of the West half of the Northeast quarter, North 00° 13' 06" West 200 feet; thence South 89° 46' 54" West 93.00 feet; thence South 28° 01' 48" west 226.37 feet to a point 30 feet Northerly of the Southerly line of said West half of the Northeast quarter; thence North 89° 57' 04" East 200.14 feet to the point of beginning.

### PARCEL 51: APN: 050-030-07-01 portion

All Lots and Blocks in Subdivision No. 1 of the Townsite of Jasmine, in the unincorporated area, County of Kern, State of California, as per map thereof recorded January 9, 1912 in Book 2, Page 40 of Maps, in the office of the County Recorder of said County, excepting therefrom the following:

(A) that portion which is included within Tract No. 2, being a Replat of Subdivision No. 1 of the Townsite of Jasmine, as per map filed November 30, 1912 in Book 2, Page 53 of Maps, in the office of the County Recorder of said County.

(B) all that portion of the West half of the Northeast quarter of Section 23, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, described as follows:

Beginning at a point in the Easterly line of said West half, North 00° 13' 06" West 30 feet from the Southeast corner of said West half; thence continuing along said Easterly line of West half North 00° 13' 06" West 200 feet; thence South 89° 46' 54" West 93.00 feet; thence South 28° 01' 48" West 226.37 feet to a point 30 feet Northerly of the Southerly line of said West half; thence North 89° 57' 04" East 200.14 feet to the point of beginning.

Being a portion of Blocks 5, 12, C, and N as per map of Subdivision No. 1 of Townsite of Jasmine, as per map filed January 9, 1912, as conveyed by William C. McCowan to the Delano Union School District in deed dated October 20, 1948 and recorded December 22, 1948 in Book 1523, Page 274 of Official Records.

Also Excepting therefrom, that portion thereof which lies within Block 28 in the Subdivision No. 1 of the Townsite of Jasmine, as per map thereof recorded January 9, 1912 in Book 2, Page 40 of Maps, Kern County Records.

Also Excepting therefrom an undivided one-fourth of all the oil, gas and other hydrocarbon substances in, upon or under said premises or any portion thereof and the right to prospect to the same and to drill for and to produce and take away the same and the right to enter upon said premises for the above mentioned purposes from time to time with due regard to the use of the same as excepted by Nick Bozanich, Sr., in deed recorded arch 22, 1966 in Book 3930, Page 406 as Document No. 15533 of Official Records.

Also Excepting therefrom an undivided one-fourth of all the oil, gas and other hydrocarbon substances in, upon or under said premises or any portion thereof and the right to prospect and to drill for and to produce and take away the same and the right to enter upon said premises for the above mentioned purposes from

time to time with due regard to the use of the same, as excepted Peter Bozanich, et al, in deed recorded March 22, 1966 in Book 3930, Page 410 as Document No. 15535 of Official Records.

## PARCEL 52: APN: 050-030-07-01 portion

All Lots and Blocks in Tract No. 2, being a Replat of Subdivision No. 1 of the Townsite of Jasmine, as per map filed November 30, 1912 in Book 2, Page 53 of Maps, in the office of the County Recorder of said County.

Excepting therefrom Lot 6 in Block 9 thereof.

Also Excepting therefrom an undivided one-fourth of all the oil, gas and other hydrocarbon substances in, upon or under said premises or any portion thereof and the right to prospect to the same and to drill for and to produce and take away the same and the right to enter upon said premises for the above mentioned purposes from time to time with due regard to the use of the same as excepted by Nick Bozanich, Sr., in deed recorded arch 22, 1966 in Book 3930, Page 406 as Document No. 15533 of Official Records.

Also Excepting therefrom an undivided one-fourth of all the oil, gas and other hydrocarbon substances in, upon or under said premises or any portion thereof and the right to prospect and to drill for and to produce and take away the same and the right to enter upon said premises for the above mentioned purposes from time to time with due regard to the use of the same, as excepted Peter Bozanich, et al, in deed recorded March 22, 1966 in Book 3930, Page 410 as Document No. 15535 of Official Records.

## PARCEL 53: APN: 060-160-15-01

The East half of fractional Section 4, Township 26 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof, lying West of the West line of that certain strip of land heretofore conveyed to Stockton and Tulare Railroad Company, a corporation, by deed recorded April 12, 1888 in Book 25, Page 414 of Deeds, and by deed recorded May 2, 1888 in Book 25, Page 406 of Deeds.

Excepting therefrom an undivided one-half of all gas, oil and other hydrocarbon substances in, upon or under said premises, as reserved by Emily S. Mansfield in deed recorded August 31, 1944 in Book 1212, Page 212 of Official Records.

Also Excepting therefrom an undivided one-fourth interest in and to all oil, gas, hydrocarbons and all other minerals of every kind and character, in, under and that may be produced from said land, as reserved by A. Perelli-Minetti & Sons, a corporation, in deed recorded February 7, 1950 in Book 1662, Page 95 as Document No. 5313 of Official Records.

Also Excepting therefrom an undivided one-half interest in the remaining interest in the oil, gas or other hydrocarbon substances lying in, upon or under said land, as reserved by A. Shrier & Sons Company, et al, in deed recorded March 24, 1961 in Book 3362, Page 663 as Document No. 18235 of Official Records.

Also Excepting therefrom all remaining interest in all oil, gas, minerals, hydrocarbon and hydrocarbon substances within and underlying said land or that may be produced therefrom, as excepted and reserved by S.A. Camp Ginning Company in deed recorded July 7, 1972 in Book 4696, Page 221 as Document No. 01026 of Official Records.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

### PARCEL 54: APN: 060-160-68

Those portions of that 100 foot wide railroad located in the East half of Section 4 and the Northwest quarter of the Northwest quarter of Section 3, both in Township 26 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, as per the Official Plat thereof, the centerline of said 100 foot parcel is described as follows:

PARCEL A:

Commencing at a point in the centerline of the Stockton and Tulare Company's Railway with the North line of said Section 3; thence Southwesterly along said centerline to a point that intersects the West line of said Section 3, as conveyed by deed recorded February 1, 1888 in Book 23, Page 39 of Deeds.

PARCEL B:

Commencing at a point in the centerline of the Stockton and Tulare Company's Railway with the East line of the Northeast quarter of said Section 4; thence Southwesterly along said centerline to a point that intersects the South line of said Northeast quarter of Section 4, as conveyed by deed recorded May 2, 1888 in Book 25, Page 406 of Deeds.

PARCEL C:

Commencing at a point in the centerline of the Stockton and Tulare Company's Railway with the North line of the Southeast quarter of said Section 4; thence Southwesterly along said centerline to a point that intersects the South line of said Southeast quarter of Section 4, as conveyed by deed recorded April 12, 1888 in Book 24, Page 414 of Deeds.

Excepting therefrom all minerals and all mineral rights of every kind as reserved by Union Pacific Railroad Company in Quitclaim Deed recorded June 26, 2001 as Document No. 0201088428 of Official Records.

### TRACT B

### PARCEL 1: APN: 049-032-01-00

THE NORTH HALF OF THE NORTHWEST QUARTER OF FRACTIONAL SECTION 5, TOWNSHIP 25 SOUTH, RANGE 26 EAST MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM, THE WEST 30 FEET; THE NORTH 30 FEET; AND THE EAST 25 FEET, HERETOFORE RESERVED FOR ROAD PURPOSES IN THE DEED FILED ON JUNE 23, 1939, AS CERTIFICATE NO. 67, MEMORIAL NO. 280, IN VOLUME 1, PAGE 134 IN THE TORRENS SYSTEM.

ALSO EXCEPTING THEREFROM, THE NORTH 30 FEET OF SAID LAND, AS CONVEYED TO THE COUNTY OF KERN FOR PUBLIC USE, BY FINAL JUDGMENT IN EMINENT DOMAIN RECORDED JULY 12, 1971, IN BOOK 4547, PAGE 872 OF OFFICIAL RECORDS, AS DOCUMENT NO. 02538.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

ALSO EXCEPTING THEREFROM, ONE-HALF OF ALL OIL, GAS AND MINERALS IN AND UNDER SAID LAND AS CONVEYED TO CALIFORNIA LANDS, INC., A CORPORATION, IN THE DEED RECORDED JANUARY 31, 1935, IN BOOK 560, PAGES 307 & 308 OF OFFICIAL RECORDS, AS DOCUMENT NO. 2228.

ALSO EXCEPTING THEREFROM, 25% OF ALL OIL, GAS AND MINERALS IN AND UNDER SAID LAND AS RESERVED BY ISABELL HANEMIAN, IN THE DEED FILED ON JANUARY 24, 1952, AS MEMORIAL NO. 608 IN OF TORRENS SYSTEM.

ALSO EXCEPTING THEREFROM, 25% OF ALL OIL, GAS AND MINERALS IN AND UNDER SAID LAND AS RESERVED BY ALMA MAY HOFER, A WIDOW, IN THE DEED RECORDED JANUARY 3, 1977, IN BOOK 4999, PAGE 1616 OF OFFICIAL RECORDS, AS DOCUMENT NO. 00110.

**PARCEL 2: APN: 049-040-03-00 AND 049-040-004-00**

LOTS 65, 72, 73, 74, 79 AND 80 OF CENTRAL CALIFORNIA FARMS COMPANY SUBDIVISION NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED APRIL 3, 1912, IN BOOK 2, PAGE 45 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

TOGETHER WITH, THAT PORTION OF COUNTY ROAD NO. 1203 KNOWN AS BASSETT AVENUE, AS ABANDONED BY RESOLUTION NO. 2005-091, RECORDED MARCH 15, 2018, AS DOCUMENT NO. 218017195, OF OFFICIAL RECORDS, WHICH WOULD PASS BY OPERATION OF LAW.

EXCEPTING THEREFROM, ALL OF GRANTORS RIGHT TITLE AND INTEREST IN AND TO ALL OF THE MINERALS, METALS, METALLIFEROUS SUBSTANCES, OIL, GAS AND OTHER HYDROCARBONS IN AND UNDER SAID LAND, TOGETHER WITH, THE RIGHT AT ALL TIMES TO ENTER UPON SAID LAND AND TO EXPLORE, DRILL, MINE, PRODUCE, PROCESS, STORE, MARKET AND REMOVE SUCH MINERALS, METALS, METALLIFEROUS SUBSTANCES, OIL, GAS AND OTHER HYDROCARBONS, AND THEREON TO CONDUCT ALL OPERATIONS AND TO ERECT, MAINTAIN AND REMOVE ALL STRUCTURES, FIXTURES, IMPROVEMENTS, PIPE LINES AND OTHER FACILITIES WHICH MAY BE NECESSARY OR USEFUL FOR ANY OF SUCH PURPOSES, SUBJECT TO THE TERMS AND CONDITIONS CONTAINED THEREIN, AS CONVEYED TO EARL FRUIT COMPANY, A CALIFORNIA CORPORATION, IN THE QUITCLAIM DEED RECORDED APRIL 3, 1962, IN BOOK 3478, PAGE 616 OF OFFICIAL RECORDS, AS DOCUMENT NO. 20013.

**PARCEL 3: APN: 049-040-05-00**

LOTS 75, 76, 77 AND 78 OF CENTRAL CALIFORNIA FARMS COMPANY SUBDIVISION NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED APRIL 3, 1912, IN BOOK 2, PAGE 45 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM, ONE-HALF OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN, UPON OR UNDER SAID PREMISES OR ANY PORTION THEREOF AND THE RIGHT TO PROSPECT FOR THE SAME AND TO DRILL FOR AND TO PRODUCE AND TAKE AWAY THE SAME AND LIKEWISE RESERVING UNTO THEM AND TO

THEIR HEIRS, SUCCESSORS AND ASSIGNS THE RIGHT TO ENTER UPON SAID PREMISES FOR THE ABOVE MENTIONED PURPOSES FROM TIME TO TIME WITH DUE REGARD TO THE USE OF THE SAME BY GRANTEE, ALL AS RESERVED BY E. L. WILLIAMS RANCHES, INC., A CALIFORNIA CORPORATION, IN THE DEED RECORDED JANUARY 16, 1990, BOOK 6335, PAGE 1658 OF OFFICIAL RECORDS, AS DOCUMENT NO. 005955.

### PARCEL 4: APN: 049-110-11-00

LOT 16 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

### PARCEL 5: APN: 049-110-12-00

LOT 15 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

EXCEPTING THEREFROM, A LIFE ESTATE IN AND TO AN UNDIVIDED ONE-HALF INTEREST IN ALL MINERALS, INCLUDING OIL AND GAS AND OTHER HYDROCARBONS UNDERLYING SAID LAND, AS RESERVED BY ETHEL MAY ROGERS, IN THE DEED RECORDED JANUARY 26, 1966, IN BOOK 3913, PAGE 565 OF OFFICIAL RECORDS, AS DOCUMENT NO. 04337.

### PARCEL 6: APN: 049-110-13-00

LOT 24 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

### PARCEL 7A: APN: 049-110-16-01

LOTS 22 AND 23 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

EXCEPTING FROM SAID LOT 22, ONE-HALF ACRE IN THE FORM OF A SQUARE IN THE NORTHEAST CORNER OF SAID LOT 22.

### PARCEL 8: APN: 049-110-18-00

LOT 29 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

TOGETHER WITH, THAT PORTION OF HRONIS STREET, AS ABANDONED BY RESOLUTION NO. 810497, RECORDED MAY 18, 1981, IN BOOK 5375, PAGE 733 OF OFFICIAL RECORDS, AS DOCUMENT NO. 050848, OF OFFICIAL RECORDS, WHICH WOULD PASS BY OPERATION OF LAW.

EXCEPTING THEREFROM, A PARCEL OF LAND IN SECTION 9, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO BASE MERIDIAN, HAVING AN AREA OF 4.4 ACRES, MORE OR LESS, AND BEING ALL THAT PART OF LOT 29, RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, AS SHOWN ON THE OFFICIAL MAP THEREOF, RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF SAID KERN COUNTY ON FEBRUARY 18, 1911 IN BOOK 2, PAGE 17 OF MAPS, AS CONVEYED TO THE UNITED STATES OF AMERICA IN THE DEED RECORDED NOVEMBER 23, 1949 IN BOOK 1653, PAGE 243 OF OFFICIAL RECORDS, AS DOCUMENT NO. 41617, LYING ON THE LEFT OR EASTERLY AND SOUTHERLY SIDE OF A LINE DESCRIBED AS FOLLOWS:

BEGINNING, AT A POINT IN THE NORTHERLY BOUNDARY OF SAID LOT 29 THAT IS DISTANT ALONG SAID NORTHERLY BOUNDARY NORTH 89 DEGREES 58' WEST 272.8 FEET FROM THE NORTHEAST CORNER OF SAID LOT 29; THENCE, RUNNING SOUTH 0 DEGREES 43' WEST 622.0 FEET TO A POINT THAT IS DISTANT NORTH 0 DEGREES 43' EAST, 8.1 FEET FROM THE SOUTHERLY BOUNDARY OF SAID LOT 29; THENCE, SOUTH 88 DEGREES 08' WEST 245.7 FEET TO A POINT IN THE SOUTHERLY BOUNDARY OF SAID LOT 29, THAT IS DISTANT ALONG SAID SOUTHERLY BOUNDARY NORTH 89 DEGREES 59' WEST, 525.1 FEET FROM THE SOUTHEAST CORNER OF SAID LOT 29.

ALSO EXCEPTING THEREFROM, ONE-HALF OF ALL OIL, GAS AND MINERAL RIGHTS IN, UPON OR UNDER SAID PREMISES INCLUDING ONE-HALF OF ANY AND ALL ROYALTIES, BONUSES, RENTALS OR ADVANCE PAYMENTS MADE OR GIVEN FOR A LEASE FOR THE RIGHT TO DRILL OR PROSPECT FOR OIL, GAS OR OTHER MINERALS UPON SAID PROPERTY, AS RESERVED BY RICHGROVE LAND COMPANY, IN THE DEED RECORDED FEBRUARY 13, 1941, IN BOOK 1014, PAGE 16 OF OFFICIAL RECORDS, AS DOCUMENT NO. 4262.

ALSO EXCEPTING THEREFROM, ONE-HALF OF ALL OIL, GAS MINERALS AND OTHER HYDROCARBON SUBSTANCES, IN, UPON OR UNDER SAID PREMISES OR ANY PORTION THEREOF AND THE RIGHT TO PROSPECT FOR THE SAME AND TO DRILL FOR AND TO PRODUCE AND TAKE AWAY THE SAME AND LIKEWISE RESERVING UNTO HER AND TO HER HEIRS, SUCCESSORS AND ASSIGNS, THE RIGHT TO ENTER UPON SAID PREMISES FOR THE ABOVE MENTIONED PURPOSES FROM TIME TO TIME WITH DUE REGARD TO THE USE OF THE SAME BY THE GRANTEE, AS RESERVED BY CATHERINE BUTLER, IN THE DEED RECORDED DECEMBER 9, 1976, IN BOOK 4994, PAGE 1598 OF OFFICIAL RECORDS, AS DOCUMENT NO. 46689.

## PARCEL 8A:

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

**PARCEL 9: APN: 049-110-20-00**

LOT 21 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

TOGETHER WITH, THAT PORTION OF HRONIS STREET, AS ABANDONED BY RESOLUTION NO. 810497, RECORDED MAY 18, 1981, IN BOOK 5375, PAGE 733 OF OFFICIAL RECORDS, AS DOCUMENT NO. 050848, OF OFFICIAL RECORDS, WHICH WOULD PASS BY OPERATION OF LAW.

EXCEPTING THEREFROM, ALL THAT PORTION OF LOT 21 OF THE RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, AS SHOWN ON THE OFFICIAL MAP THEREOF, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAID KERN COUNTY ON FEBRUARY 18, 1911 IN BOOK 2, PAGE 17, AS CONVEYED TO THE UNITED STATES OF AMERICA IN THE DEED RECORDED JUNE 14, 1950, IN BOOK 1689, PAGE 291 OF OFFICIAL RECORDS, AS DOCUMENT NO. 24491, LYING EASTERLY OF A LINE DESCRIBED AS FOLLOWS:

BEGINNING, AT A POINT IN THE NORTHERLY BOUNDARY OF SAID LOT 21 THAT IS DISTANT ALONG SAID NORTHERLY BOUNDARY LINE NORTH 89 DEGREES 58' WEST 275.5 FEET FROM THE NORTHEAST CORNER OF SAID LOT 21; THENCE, RUNNING SOUTH 0 DEGREES 09' EAST 630.0 FEET TO A POINT IN THE SOUTHERLY BOUNDARY OF SAID LOT 21 THAT IS DISTANT ALONG SAID SOUTHERLY BOUNDARY NORTH 89 DEGREES 58' WEST 272.8 FEET FROM THE SOUTHEAST CORNER OF SAID LOT 21.

**PARCEL 9A:**

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

**PARCEL 10: APN: 049-110-23-00**

LOT 27 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

ALSO EXCEPTING THEREFROM, AN UNDIVIDED ONE-HALF INTEREST OF ALL OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM, AS RESERVED BY ARTHUR LYNN HICKMAN AND VERNA A. HICKMAN, HUSBAND AND WIFE, IN THE DEED RECORDED FEBRUARY 24, 1953, IN BOOK 2043, PAGE 349 OF OFFICIAL RECORDS, AS DOCUMENT NO. 8623.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

**PARCEL 10A:**

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

**PARCEL 11: APN: 049-110-31-00**

LOTS 17, 18, 25 AND 26 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

EXCEPTING THEREFROM, AN UNDIVIDED ONE-HALF OF ALL OIL, GAS, AND OTHER MINERALS AND MINERAL RIGHTS OF WHATEVER NATURE OR DESCRIPTION IN AND UNDER SAID LAND; AND EXPRESSLY RESERVING TO THE GRANTORS, ITS SUCCESSORS OR ASSIGNS, THE EXCLUSIVE RIGHT, IN CONJUNCTION WITH THE OWNER OR OWNERS OF THE REMAINDER OF SAID OIL, GAS, AND OTHER MINERALS AND MINERALS RIGHTS, TO PROSPECT FOR AND EXPLOIT AND TO DEVELOPMENT REMOVE THE SAID OIL, GAS, AND OTHER MINERALS FORM SAID LANDS; TOGETHER WITH, THE REASONABLE USE OF SUCH RIGHTS OF WAY AND OTHER PRIVILEGES IN AND OVER THE SURFACE OF SAID LAND AS MAY BE REASONABLY REQUIRED FOR DOING THE WORK ABOVE DESCRIBED IN A REASONABLE MANNER, ALL AS RESERVED BY RICHGROVE LAND COMPANY, IN THE DEED RECORDED JUNE 19, 1940, IN BOOK 946, PAGES 406 & 407 OF OFFICIAL RECORDS, AS DOCUMENT NO. 16099.

**PARCEL 12: APN: 049-110-32-00**

LOT 19 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

EXCEPTING THEREFROM, AN UNDIVIDED ONE-HALF OF ALL OIL, GAS, AND OTHER MINERALS AND MINERAL RIGHTS OF WHATEVER NATURE OR DESCRIPTION IN AND UNDER SAID LAND; AND EXPRESSLY RESERVING TO THE GRANTORS, ITS SUCCESSORS OR ASSIGNS, THE EXCLUSIVE RIGHT, IN CONJUNCTION WITH THE OWNER OR OWNERS OF THE REMAINDER OF SAID OIL, GAS, AND OTHER MINERALS AND MINERALS RIGHTS, TO PROSPECT FOR AND EXPLOIT AND TO DEVELOPMENT REMOVE THE SAID OIL, GAS, AND OTHER MINERALS FORM SAID LANDS; TOGETHER WITH, THE REASONABLE USE OF SUCH RIGHTS OF WAY AND OTHER PRIVILEGES IN AND OVER THE SURFACE OF SAID LAND AS MAY BE REASONABLY REQUIRED FOR DOING THE WORK ABOVE DESCRIBED IN A REASONABLE MANNER, ALL AS RESERVED BY RICHGROVE LAND COMPANY, IN THE DEED RECORDED JUNE 19, 1940, IN BOOK 946, PAGES 406 & 407 OF OFFICIAL RECORDS, AS DOCUMENT NO. 16099.

**PARCEL 12A:**

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

### PARCEL 13: APN: 049-110-34-00

LOTS 1, 2, 9 AND 10 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.
EXCEPTING THEREFROM, THE WELL SITE DESCRIBED AS THE NORTH 100 FEET OF THE EAST 100 FEET OF SAID LOT 2, TOGETHER WITH A PIPELINE EASEMENT ALONG THE NORTH 20 FEET OF SAID LOTS 1 AND 2, AS RESERVED BY M. CARATAN, INC., A CALIFORNIA CORPORATION, IN THE DEED RECORDED JANUARY 7, 1974, IN BOOK 4820, PAGE 72 OF OFFICIAL RECORDS, AS DOCUMENT NO. 00829.

### PARCEL 13A:

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

### PARCEL 14: APN: 049-110-22-00

LOTS 20 AND 28 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

TOGETHER WITH, THAT PORTION OF HRONIS STREET, AS ABANDONED BY RESOLUTION NO. 810497, RECORDED MAY 18, 1981, IN BOOK 5375, PAGE 733 OF OFFICIAL RECORDS, AS DOCUMENT NO. 050848, OF OFFICIAL RECORDS, WHICH WOULD PASS BY OPERATION OF LAW.

EXCEPTING THEREFROM, AN UNDIVIDED ONE-FOURTH INTEREST IN AND TO ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER OR RECOVERABLE THEREON OR THEREFROM, AS CONVEYED TO M. P. MOSESIAN, A MARRIED MAN, AS HIS SEPARATE PROPERTY, IN THE DEED OF MINERAL RIGHTS, RECORDED JUNE 7, 1962, IN BOOK 3498, PAGE 154 OF OFFICIAL RECORDS, AS DOCUMENT NO. 33413.

ALSO EXCEPTING THEREFROM, AN UNDIVIDED THREE-FOURTHS INTEREST IN AND TO ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

OR RECOVERABLE THEREON OR THEREFROM, AS CONVEYED TO M. P. MOSESIAN, A MARRIED MAN, IN THE DEED RECORDED SEPTEMBER 16, 1963, IN BOOK 3644, PAGE 431 OF OFFICIAL RECORDS, AS DOCUMENT NO. 57868.

### PARCEL 15: APN: 049-150-03-00

THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 7, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM, ALL OIL, GAS, MINERALS, HYDROCARBON SUBSTANCES OF ANY AND EVERY KIND WITHIN OR UNDERLYING SAID LAND AS PREVIOUSLY RESERVED OF RECORD, AS RESERVED BY BANK OF AMERICA NT&SA, AS TRUSTEE UNDER THE TERMS OF THE TESTAMENTARY TRUST ESTABLISHED IN THE WILL OF MARTIN J. GUTUNICH, DECEASED, AS TO 1/8TH INTEREST; MARTINA M. GUTUNICH, AS TO 3/16THS INTEREST; AND MARTY JOSEPHINE DISPOTO, AS TO ½ INTEREST, IN THE DEED RECORDED SEPTEMBER 21, 1982, IN BOOK 5490, PAGE 1676 OF OFFICIAL RECORDS, AS DOCUMENT NO. 030536.

### PARCEL 16: APN: 049-150-08-00

THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM, THAT CERTAIN WATER WELL EASEMENT LOCATED ON THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, TOGETHER WITH, PUMP, MOTOR, UNDERGROUND PIPELINES WITH THE RIGHT OF INGRESS AND EGRESS THEREWITH AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

ALSO EXCEPTING THEREFROM, AN UNDIVIDED ONE-HALF INTEREST IN ALL OIL, GAS AND MINERALS IN AND UNDER SAID LAND, TOGETHER WITH, THE RIGHT OF THE GRANTOR, ITS SUCCESSORS AND ASSIGNS AND LEGAL REPRESENTATIVES AT ALL TIMES TO ENTER ON THE ABOVE DESCRIBED LANDS AND TAKE ALL THE USUAL, NECESSARY OR CONVENIENT MEANS TO BORE WALLS, MAKE EXCAVATIONS AND TO REMOVE ALL THE OIL, GAS AND MINERALS FOUND THEREON AND HEREIN RESERVED, AS RESERVED BY BANK OF AMERICA, NT & SA, IN THE DEED RECORDED DECEMBER 31, 1934, IN BOOK 554, PAGE 64 OF OFFICIAL RECORDS, AS DOCUMENT NO. 20873.

### PARCEL 17: INTENTIONALLY DELETED

### PARCEL 18: APN: 050-220-07-01

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

THE SOUTH HALF OF THE SOUTHEAST QUARTER OF SECTION 30, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM, ONE-HALF OF ALL OIL, GAS AND MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING OR THAT MAY BE PRODUCED AND SAVED FROM SAID LAND, TOGETHER WITH THE RIGHT TO PROSPECT FOR, MINE AND REMOVE THE SAME, AS RESERVED BY T. A. DAVIS, ALSO KNOWN AS THOMAS ALBERT DAVIS AND INA B. DAVIS, HIS WIFE, IN THE DEED RECORDED MAY 8, 1945, IN BOOK 1252, PAGE 226 OF OFFICIAL RECORDS, AS DOCUMENT NO. 12223.

ALSO EXCEPTING THEREFROM, AN UNDIVIDED ONE-FOURTH INTEREST IN AND TO ALL OIL, GAS, PETROLEUM, AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY PETER G. BOUMA, IN THE DEED RECORDED JANUARY 14, 1977, IN BOOK 5001, PAGE 1552 OF OFFICIAL RECORDS, AS DOCUMENT NO. 3231.

### PARCEL 19: APN: 050-270-06-00 & 050-270-015-00

LOT 12 AND ALL THAT PORTION OF LOT 13 LYING EAST OF THE RIGHT OF WAY OF THE SOUTHERN PACIFIC RAILROAD IN THE HILLCREST TRACT, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 14, 1911, IN BOOK 2, PAGE 16 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. SAID SOUTHERN PACIFIC RAILROAD RIGHT OF WAY BEING A STRIP OF LAND 100 FEET IN WIDTH, CREATED IN THE DEED TO STOCKTON AND TULARE RAILROAD COMPANY, RECORDED MAY 19, 1988, IN BOOK 27, PAGES 41, 42 & 43 OF DEEDS, AND SUBSEQUENTLY SHOWN ON THE MAP OF SAID TRACT.

EXCEPTING THEREFROM, THE RIGHTS OR INTEREST CONVEYED TO THE COUNTY OF KERN, IN ALL THAT PORTION OF LOT 13, LYING WITHIN THE RELINQUISHED PORTION OF SUPERSEDED HIGHWAY, DESCRIBED IN THE INSTRUMENT RECORDED JANUARY 10, 1948, IN BOOK 1341, PAGE 446 OF OFFICIAL RECORDS, AS DOCUMENT NO. 1184.

### PARCEL 20: APN: 050-270-14-00

ALL THAT PORTION OF LOT 5, LYING EAST OF THE RIGHT OF WAY OF THE SOUTHERN PACIFIC RAILROAD IN THE HILLCREST TRACT, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 14, 1911, IN BOOK 2, PAGE 16 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. SAID SOUTHERN PACIFIC RAILROAD RIGHT OF WAY BEING A STRIP OF LAND 100 FEET IN WIDTH, CREATED IN THE DEED TO STOCKTON AND TULARE RAILROAD COMPANY, RECORDED MAY 19, 1988, IN BOOK 27, PAGES 41, 42 & 43 OF DEEDS, AND SUBSEQUENTLY SHOWN ON THE MAP OF SAID TRACT.

EXCEPTING THEREFROM, ALL OF THE PETROLEUM, GAS, ASPHALTUM AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR UNDERLYING OR THAT MAY BE PRODUCED FROM THE PROPERTY ABOVE DESCRIBED, AS RESERVED BY LILLIAM H. BEARDSLEY, A WIDOW, STEPHEN T. CLIFFORD, A SINGLE MAN, AND LINDA M. CLIFFORD, A SINGLE WOMAN, IN

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

THE DEED RECORDED DECEMBER 31, 1963, IN BOOK 3676, PAGE 677 OF OFFICIAL RECORDS, AS DOCUMENT NO. 80736.

**PARCEL 21: APN: 049-110-25-00**

A PARCEL OF LAND IN THE NORTHEAST QUARTER OF SECTION 9, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE OFFICIAL PLAT THEREOF, BEING A PORTION OF THE 5.6-ACRE PARCEL OF LAND DESCRIBED IN THE DEED TO THE UNITED STATES OF AMERICA, DATED MAY 13, 1949, AND RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY ON JULY 10, 1950 IN BOOK 1712 OF OFFICIAL RECORDS AT PAGE155, AND A PORTION OF THE 10.0-ACRE PARCEL OF LAND DESCRIBED AS TRACT 1 OF PARCEL ONE IN SCHEDULE "A" OF THE DECREE ON DECLARATION OF TAKING DATED JANUARY 3, 1950, IN AN ACTION ENTITLED UNITED STATES OF AMERICA, PLAINTIFF, VS. 303.3-ACRES OF LAND, MORE OR LESS, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, MARIN CURATEN, ALSO KNOWN AS M. CURATEN, ET AL., DEFENDANTS IN THE UNITED STATES DISTRICT COURT IN AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA, NORTHERN DIVISION, CIVIL NO. 894-ND; A CERTIFIED COPY OF SAID DECREE WAS RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY ON JANUARY 11, 1950 IN BOOK 1648 OF OFFICIAL RECORDS AT PAGE 325 AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTH QUARTER CORNER OF SAID SECTION 9;

THENCE, ALONG THE NORTHERLY BOUNDARY OF SAID 5.8-ACRE PARCEL, WHICH IS IN THE NORTHERLY BOUNDARY OF THE NE 1/4 OF SAID SECTION 9, SOUTH 89° 57' EAST 28.6 FEET;

THENCE, ENTERING SAID 5.8-ACRE PARCEL SOUTH 6° 17' EAST 230.7 FEET;

THENCE, SOUTH 23° 49' EAST 184.4 FEET;

THENCE, SOUTH 29° 52' EAST 302.5 FEET TO THE BOUNDARY COMMON TO SAID 5.8-ACRE PARCEL AND SAID 10.0 ACRE PARCEL;

THENCE, ENTERING SAID 10.0-ACRE PARCEL SOUTH 29° 52' EAST 106.7 FEET;

THENCE, SOUTH 22° 47' EAST 131.3 FEET;

THENCE, SOUTH 08° 38' EAST 130.2 FEET;

THENCE, SOUTH 00° 06' WEST 317.8 FEET TO THE SOUTHERLY BOUNDARY OF SAID 10.0-ACRE PARCEL;

THENCE, ALONG SAID SOUTHERLY BOUNDARY NORTH 89° 58' WEST 403.8 FEET TO THE WESTERLY BOUNDARY OF SAID 10.0-ACRE PARCEL;

THENCE, ALONG THE WESTERLY BOUNDARY OF SAID 10.0-ACRE PARCEL, WHICH IS IN THE WESTERLY BOUNDARY OF THE NORTHEAST QUARTER OF SAID SECTION 9, NORTH

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

0° 05' EAST 660.1 FEET TO THE BOUNDARY COMMON TO SAID 5.8-ACRE PARCEL AND SAID 10.0-ACRE PARCEL;

THENCE, LEAVING SAID COMMON BOUNDARY AND RUNNING ALONG THE WESTERLY BOUNDARY OF SAID 5.8-ACRE PARCEL, WHICH IS IN THE WESTERLY BOUNDARY OF THE NORTHEAST QUARTER OF SAID SECTION 9, NORTH 0° 05' EAST 660.0 FEET TO THE POINT OF BEGINNING.

SAID PARCEL OF LAND IS A PORTION OF LOTS 5 AND 13 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY, TOGETHER WITH, THAT PORTION OF HRONIS STREET, AS ABANDONED BY RESOLUTION NO. 810497, RECORDED MAY 18, 1981, IN BOOK 5375, PAGE 733 OF OFFICIAL RECORDS, AS DOCUMENT NO. 050848, OF OFFICIAL RECORDS, WHICH WOULD PASS BY OPERATION OF LAW.

EXCEPTING FROM, THAT PORTION LYING WITHIN LOT 13, AN UNDIVIDED ONE-HALF INTEREST IN AND TO ALL OIL, GAS, PETROLEUM AND OTHER HYDROCARBON AND OTHER SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY HENRY RAY ALLEN AND ELLA REBECCA ALLEN, HIS WIFE, IN THE DEED RECORDED APRIL 11, 1944 IN BOOK 117, PAGE 436 OF OFFICIAL RECORDS, AS DOCUMENT NO. 8646.

EXCEPTING FROM, THAT PORTION LYING WITHIN LOT 5, THE OIL, GAS AND OTHER HYDROCARBONACEOUS SUBSTANCES THEREIN OR THEREUNDER, PROVIDED, HOWEVER, THAT NO DIGGING OR DRILLING FOR EXPLORATION OR EXTRACTION OF SUCH OIL, GAS, OR HYDROCARBONACEOUS SUBSTANCES SHALL EVER BE CONDUCTED WITHIN THE BOUNDARIES OF SAID LAND, AS RESERVED BY PETE B. PERICH, A WIDOW, IN THE DEED RECORDED JULY 10, 1950, IN BOOK 1712, PAGE 155 OF OFFICIAL RECORDS, AS DOCUMENT NO. 28296.

ALSO EXCEPTING FROM, THAT PORTION LYING WITHIN LOT 13, ALL THE RIGHTS RESERVED BY THE UNITED STATES OF AMERICA, IN THE DEED RECORDED APRIL 26, 1962, IN BOOK 3486, PAGE 333 OF OFFICIAL RECORDS, AS DOCUMENT NO. 25305.

**PARCEL 22: INTENTIONALLY DELETED**

**PARCEL 23: INTENTIONALLY DELETED**

**PARCEL 23A: INTENTIONALLY DELETED**

**PARCEL 24: INTENTIONALLY DELETED**

**PARCEL 25: APN: 049-110-49-00**

LOT 12 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO.1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

EXCEPTING THEREFROM THE SOUTHERLY 50 FEET OF THE EASTERLY 50 FEET THEREOF.

ALSO EXCEPTING THEREFROM 3/4THS OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS THEREIN AND THEREUNDER, TOGETHER WITH ALL EASEMENTS AND RIGHTS NECESSARY OR CONVENIENT FOR THE PRODUCTION, STORAGE AND TRANSPORTATION THEREOF AND EXPLORATION AND TESTING OF THE SAID REAL PROPERTY, AND ALSO THE RIGHT TO DRILL FOR, PRODUCE AND USE WATER FROM SAID PROPERTY IN CONNECTION WITH ITS DRILLING OR MINING OPERATIONS THEREIN, AS RESERVED BY CALIFORNIA LANDS INC., A CALIFORNIA CORPORATION, IN DEED DATED JUNE 8,1938 AND RECORDED JULY 2, 1938 IN BOOK 809, PAGE 91 OF OFFICIAL RECORDS, AS DOCUMENT NO. 15579.

**PARCEL 25A:**

AN APPURTENANT EASEMENT FOR INGRESS, EGRESS AND ROAD PURPOSES OVER THE EAST 20 FEET OF LOT 4 OF SAID RICHGROVE LAND COMPANY'S COLONY TRACT NO.1, AS DISCLOSED IN DOCUMENT RECORDED DECEMBER 30, 1991, IN BOOK 6613, PAGE 583 OF OFFICIAL RECORDS.

**PARCEL 25B:**

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

**PARCEL 26: APN: 049-110-29-01 AND 049-110-29-02**

THE SOUTHERLY 50 FEET OF THE EASTERLY 50 FEET OF LOT 12 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO.1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**PARCEL 27: INTENTIONALLY DELETED**

**PARCEL 27A:**

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

**PARCEL 28: APN: 050-270-07-00**

ALL THAT PORTION OF LOT 20 LYING WEST OF THE RIGHT OF WAY OF THE SOUTHERN PACIFIC RAILROAD IN THE HILLCREST TRACT, IN THE UNINCORPORATED AREA OF THE

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 14, 1911, IN BOOK 2, PAGE 16 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. SAID SOUTHERN PACIFIC RAILROAD RIGHT OF WAY BEING A STRIP OF LAND 100 FEET IN WIDTH, CREATED IN THE DEED TO STOCKTON AND TULARE RAILROAD COMPANY, RECORDED MAY 19, 1988, IN BOOK 27, PAGES 41, 42 & 43 OF DEEDS, AND SUBSEQUENTLY SHOWN ON THE MAP OF SAID TRACT.

EXCEPTING THEREFROM, ALL OF THE PETROLEUM, GAS, ASPHALTUM AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR UNDERLYING, OR THAT MAY BE PRODUCED FROM SAID LAND, AS RESERVED BY LILLIAN H. BEARDSLEY, A WIDOW, STEPHEN T. CLIFFORD, A SINGLE MAN, AND LINDA M. CLIFFORD, A SINGLE WOMAN, IN THE DEED RECORDED DECEMBER 31, 1963, IN BOOK 3676, PAGE 677 OF OFFICIAL RECORDS, AS DOCUMENT NO. 80736.

**PARCEL 29: INTENTIONALLY DELETED**

**PARCEL 30-32: INTENTIONALLY DELETED**

**TRACT C**

**THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA OF KERN, COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:**

**PARCEL 1: APN: 049-020-06-01**

THE WEST HALF OF THE NORTHWEST QUARTER OF FRACTIONAL SECTION 3, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED ONE-HALF OF ALL OIL, GAS, HYDROCARBONS, AND OTHER MINERAL RIGHTS, AS RESERVED BY L.R. BILLINGS, AS EXECUTOR OF THE WILL OF ELMER W. HARRIS, DECEASED, IN DEED RECORDED NOVEMBER 5, 1958 IN BOOK 3031, PAGE 64 AS DOCUMENT NO. 61974 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM AN UNDIVIDED ONE-FOURTH OF ALL THE OIL, GAS, HYDROCARBONS AND OTHER MINERALS, AS RESERVED BY ELVA DAU SAY WHO ACQUIRED TITLE AS ELVA DAU, IN DEED RECORDED DECEMBER 29, 1977 IN BOOK 5078, PAGE 557 AS DOCUMENT NO. 60741 OF OFFICIAL RECORDS.

**PARCEL 2: APN: 049-250-01-00**

LOTS 65 AND 73 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

**PARCEL 3: APN: 049-250-02-00**

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

LOT 66 AND THE NORTH HALF OF LOT 74 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

EXCEPTING THEREFROM, ONE-HALF OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN, UPON OR UNDER SAID PREMISES OR ANY PORTION THEREOF, AND THE RIGHT TO PROSPECT FOR THE SAME AND TO DRILL FOR AND TO PRODUCE AND TAKE AWAY THE SAME, AND LIKEWISE RESERVING UNTO HER AND TO HER HEIRS, SUCCESSORS, AND ASSIGNS, THE RIGHT TO ENTER UPON SAID PREMISES FOR THE ABOVEMENTIONED PURPOSES FROM TIME TO TIME WITH DUE REGARD TO THE USE OF THE SAME BY THE GRANTEE, ALL AS RESERVED BY IDA BELL COLING, A WIDOW, IN THE DEED RECORDED MARCH 1, 1946, IN BOOK 1310, PAGE 17 OF OFFICIAL RECORDS, AS DOCUMENT NO. 8380.

### PARCEL 3A:

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

### PARCEL 4: APN: 051-110-29

THE NORTHEAST QUARTER OF SECTION 21, TOWNSHIP 25 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED ONE-HALF OF ALL MINERALS AND MINERAL RIGHTS OF EVERY KIND AND CHARACTER (EXCEPT WATER AND WATER RIGHTS) NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, INCLUDING WITHOUT LIMITING THE GENERALITY OF THE FOREGOING OIL, GAS AND RIGHTS THERETO, TOGETHER WITH THE SOLE, EXCLUSIVE AND PERPETUAL RIGHT TO EXPLORE FOR, REMOVE AND DISPOSE OF SAID MINERALS BY ANY MEANS OR METHODS SUITABLE TO GRANTOR, ITS SUCCESSORS AND ASSIGNS, BUT WITHOUT ENTERING UPON OR USING THE SURFACE OF SAID LAND HEREIN DESCRIBED OR ANY PORTION OF THE SUBSURFACE WITHIN 500 FEET OF THE SURFACE OF SAID LAND, AS RESERVED BY ERNEST GAILLARD, JR. AND MIGNONNE NASH GAILLARD, HUSBAND AND WIFE, AS JOINT TENANTS, IN DEED RECORDED DECEMBER 31, 1981 IN BOOK 5428, PAGE 1002 AS DOCUMENT NO. 063620 OF OFFICIAL RECORDS.

### PARCEL 5: APN: 051-110-28 & 051-110-30

THE NORTHWEST QUARTER OF SECTION 21, TOWNSHIP 25 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

EXCEPTING THEREFROM AN UNDIVIDED ONE-HALF OF ALL MINERALS AND MINERAL RIGHTS OF EVERY KIND AND CHARACTER (EXCEPT WATER AND WATER RIGHTS) NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, INCLUDING WITHOUT LIMITING THE GENERALITY OF THE FOREGOING OIL, GAS AND RIGHTS THERETO, TOGETHER WITH THE SOLE, EXCLUSIVE AND PERPETUAL RIGHT TO EXPLORE FOR, REMOVE AND DISPOSE OF SAID MINERALS BY ANY MEANS OR METHODS SUITABLE TO GRANTOR, ITS SUCCESSORS AND ASSIGNS, BUT WITHOUT ENTERING UPON OR USING THE SURFACE OF SAID LAND HEREIN DESCRIBED OR ANY PORTION OF THE SUBSURFACE WITHIN 500 FEET OF THE SURFACE OF SAID LAND, AS RESERVED BY ERNEST GAILLARD, JR. AND MIGNONNE NASH GAILLARD, HUSBAND AND WIFE, AS JOINT TENANTS, IN DEED RECORDED DECEMBER 31, 1981 IN BOOK 5428, PAGE 1002 AS DOCUMENT NO. 063620 OF OFFICIAL RECORDS.

### PARCEL 6: APN: 177-010-06-01

THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER; AND THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF FRACTIONAL SECTION 2, TOWNSHIP 30 SOUTH, RANGE 29 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL MINERALS OF EVERY KIND AND NATURE WHATSOEVER INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PETROLEUM, OIL, ASPHALTUM, GAS AND ALL OTHER HYDROCARBON SUBSTANCES, CARBON DIOXIDE, NITROGEN, SULFUR DIOXIDE, HELIUM, AND ALL OTHER NATURAL GASES, TOGETHER WITH THE EXCLUSIVE RIGHT TO PROSPECT, BORE, DRILL FOR AND PRODUCE ANY OR ALL OF SUCH MINERALS EITHER BY MEANS OF FACILITIES LOCATED ON SAID LAND OR LOCATED ON ADJOINING OR NEARBY LANDS; AND FURTHER RESERVING UNTO GRANTOR, ITS SUCCESSORS AND ASSIGNS, THE EXCLUSIVE EASEMENTS AND RIGHT TO BORE OR DRILL IN AND THROUGH SAID ABOVE-DESCRIBED PROPERTY TO EXPLORE FOR AND EXTRACT PETROLEUM, OIL, ASPHALTUM, GAS, AND OTHER HYDROCARBON SUBSTANCES, NITROGEN, CARBON DIOXIDE, SULFUR DIOXIDE, HELIUM AND ALL OTHER NATURAL GASES AND MINERALS OF EVERY KIND AND NATURE WHATSOEVER FROM ADJOINING OR NEARBY LANDS, GRANTOR ALSO RESERVES THE RIGHT TO DRILL FOR, DEVELOP, AND USE SUCH WATER ON SAID ABOVE-DESCRIBED PROPERTY AS GRANTOR MAY REQUIRE FOR ITS DRILLING AND/OR PRODUCING OPERATIONS ONLY, ALL AS RESERVED BY SOCONY MOBIL OIL CO., INC., A NEW YORK CORPORATION, SUCCESSOR IN INTEREST TO GENERAL PETROLEUM CORPORATION, IN DEED RECORDED AUGUST 8, 1962 IN BOOK 3517, PAGE 213 AS DOCUMENT NO. 46382 OF OFFICIAL RECORDS.

### PARCEL 7: APN: 503-010-16

THAT PORTION OF THE RANCHO EL TEJON, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, PATENTED BY THE UNITED STATES OF AMERICA TO JOSE ANTONIO AGUIRRE AND IGNACIO DEL VALLE, BY PATENT RECORDED IN BOOK 2, PAGE 24 OF PATENTS, IN OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL C-16, AS SHOWN ON THE RECORD OF SURVEY MAP RECORDED JULY 5, 1968 IN BOOK 9, PAGE 146 OF RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, BEING A PORTION OF LOT 37 OF SAID RANCHO EL TEJON, IN SECTION 10, TOWNSHIP 31 SOUTH, RANGE 30 EAST MOUNT DIABLO BASE AND MERIDIAN, AS MORE PARTICULARLY SHOWN ON SAID RECORD OF SURVEY MAP.

EXCEPTING THEREFROM THE EASTERLY 330 FEET OF THE NORTH HALF OF SAID PARCEL C-16.

ALSO EXCEPTING THEREFROM THOSE PORTIONS, IF ANY, WITHIN THE FEE SIMPLE PARCELS TAKEN BY FINAL DECREE OF CONDEMNATION, A CERTIFIED COPY OF WHICH WAS RECORDED FEBRUARY 24, 1970 IN BOOK 4369, PAGE 405 AS DOCUMENT NO. 09844 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS AND MINERAL RIGHTS, AS RESERVED BY TEJON RANCH CO., IN DEED RECORDED OCTOBER 30, 1970 IN BOOK 4453, PAGE 438 AS DOCUMENT NO. 67431 OF OFFICIAL RECORDS. A QUITCLAIM DEED RECORDED OCTOBER 30, 1970 IN BOOK 4453, PAGE 502 AS DOCUMENT NO. 67445 OF OFFICIAL RECORDS, EXECUTED BY TEJON RANCH CO., A CALIFORNIA CORPORATION, DOES REMISE, RELEASE AND FOREVER QUITCLAIM TO CHARLES N. HEIN, JR., ET AL, ALL RIGHT TO THE USE OF THE SURFACE OF SAID LAND OR ANY OTHER PORTION THEREOF ABOVE A DEPTH OF 500 FEET FROM THE SURFACE THEREOF, FOR THE PURPOSE OF DRILLING FOR OR DEVELOPING ANY OIL, GAS, MINERALS, OR OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, PROVIDED, HOWEVER, THAT GRANTORS HEREIN, THEIR HEIRS OR ASSIGNS SHALL HAVE THE RIGHT TO DEVELOP SUCH SUBSTANCES BY SLANT DRILLING FROM LOCATIONS ON ADJACENT LANDS AT DEPTHS OF MORE THAN 500 FEET OR FROM EASEMENTS FOR DRILLING SITES ON THE SURFACE OF THE ABOVE REAL PROPERTY. SAID DRILLING SITES ARE MORE PARTICULARLY DESCRIBED IN AN EASEMENT DEED RECORDED OCTOBER 30, 1970 IN BOOK 4453, PAGE 474 AS DOCUMENT NO. 67439 OF OFFICIAL RECORDS.

**PARCEL 8-11: INTENTIONALLY DELETED**

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

**95**

**SCHEDULE 1.01(B) Permitted**

**Priority Liens**

**(to be submitted by supplement)**

SCHEDULE 1.01(B)

**EXHIBIT A Initial Budget**

EXHIBIT A

**EXHIBIT B**

**Form of Interim DIP Financing Order**

EXHIBIT B

# EXHIBIT 2

*DRAFT*

**HRONIS, INC. / HRONIS FARMING**

*PRELIMINARY / SUBJECT TO CHANGE*

**DIP BUDGET**

| ($ in 000s) | Actuals | Actuals | Actuals | Actuals | Actuals | Actuals | | | | | | | | Post-Petition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| Week Ended | 3/15 | 3/22 | 3/29 | 4/5 | 4/12 | 4/19 | 4/26 | 5/3 | 5/10 | 5/17 | 5/24 | 5/31 | 6/7 | |
| **CASH FLOW** | | | | | | | | | | | | | | |
| Grapes | - | - | - | - | - | - | - | - | - | - | - | - | 11,964 | **11,964** |
| Other | - | - | - | - | 66 | 44 | - | - | - | - | - | - | - | **110** |
| Receipts Escrow | - | - | - | - | - | - | - | - | - | - | - | - | (11,964) | **(11,964)** |
| **Total Receipts** | - | - | - | - | 66 | 44 | - | - | - | - | - | - | - | **110** |
| **Oper Disbursements** | | | | | | | | | | | | | | |
| Labor | - | 198 | 187 | 190 | 189 | 207 | 220 | 212 | 212 | 212 | 287 | 212 | 499 | **2,826** |
| Land/Facilities | - | - | - | 1 | 2 | 44 | 50 | 91 | 66 | 105 | 66 | 66 | 441 | **933** |
| Farm Advisor | - | - | - | - | 55 | - | - | 60 | - | - | - | - | 60 | **175** |
| Other Ord Course Professionals | - | - | - | - | - | - | - | 25 | 25 | 25 | 25 | 25 | 25 | **150** |
| SG&A | 2 | 3 | 79 | 138 | 16 | 20 | 28 | 132 | 20 | 20 | 20 | 20 | 20 | **518** |
| Fruit Purchases | - | - | - | - | - | - | - | 14 | 26 | 24 | 24 | 24 | 150 | **262** |
| 2026 Crop Cost | (69) | 169 | 279 | 744 | 552 | 508 | 721 | 588 | 564 | 733 | 583 | 583 | 1,107 | **7,062** |
| **Total Oper Disb** | (67) | 370 | 545 | 1,073 | 814 | 780 | 1,019 | 1,122 | 913 | 1,119 | 1,005 | 930 | 2,301 | **11,924** |
| **Operating Cash Flow** | 67 | (370) | (545) | (1,073) | (748) | (735) | (1,019) | (1,122) | (913) | (1,119) | (1,005) | (930) | (2,301) | **(11,814)** |
| **Non-Op Disbursements / Pre-Petition / Restructuring** | | | | | | | | | | | | | | |
| 503(b)(9) | - | - | - | - | - | - | - | - | - | - | - | - | 75 | **75** |
| AgAmerica Interest | - | - | 2,070 | - | - | - | - | - | - | - | - | - | - | **2,070** |
| Adequate Assurance / Utility Deposit | - | - | - | 189 | 126 | - | 277 | 177 | - | - | - | - | - | **769** |
| U.S. Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | 152 | **152** |
| Claims Agent Fees | - | - | - | - | - | - | - | 10 | 10 | 10 | 10 | 10 | 105 | **155** |
| Independent Director Fees | - | - | - | 35 | - | - | - | 38 | - | - | - | - | 38 | **110** |
| Investment Banker Retainer | - | - | - | - | - | - | - | - | - | - | - | - | - | **-** |
| Lender Professionals (Adeq. Protection) | - | - | - | - | - | - | - | - | - | 660 | - | - | - | **660** |
| Rx Professional Fee Escrow | - | - | 546 | 239 | 339 | 239 | 210 | 310 | 210 | 210 | 210 | 210 | 545 | **3,269** |
| **Total Non-Op Disb** | - | - | 2,616 | 463 | 465 | 239 | 487 | 535 | 220 | 880 | 220 | 220 | 915 | **7,260** |
| **Net Cash Flow** | 67 | (370) | (3,161) | (1,536) | (1,214) | (974) | (1,506) | (1,657) | (1,133) | (1,999) | (1,225) | (1,150) | (3,216) | **(19,075)** |
| **DIP Facility** | | | | | | | | | | | | | | |
| Beginning | - | - | 1,780 | 4,784 | 6,795 | 8,186 | 9,485 | 9,507 | 11,030 | 11,805 | 13,833 | 15,115 | 16,400 | - |
| Accrued Interest | - | - | 4 | 11 | 16 | 19 | 22 | 22 | 26 | 28 | 32 | 35 | 38 | 254 |
| Lender Advances | - | 1,780 | 3,000 | 2,000 | 1,375 | 1,280 | - | 1,500 | 750 | 2,000 | 1,250 | 1,250 | 3,250 | 19,435 |
| **Ending DIP Balance** | - | 1,780 | 4,784 | 6,795 | 8,186 | 9,485 | 9,507 | 11,030 | 11,805 | 13,833 | 15,115 | 16,400 | 19,689 | **19,689** |
| Beginning Cash on Hand | (95) | (28) | 1,382 | 1,221 | 1,685 | 1,847 | 2,153 | 647 | 490 | 107 | 108 | 132 | 232 | - |
| Net Cash Flow (Pre-Petition) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Post-Petition Uses of Cash (Op & Non-Op) | 67 | (370) | (3,161) | (1,536) | (1,214) | (974) | (1,506) | (1,657) | (1,133) | (1,999) | (1,225) | (1,150) | (3,216) | **(19,074)** |
| Draw / (Repayment) | - | 1,780 | 3,000 | 2,000 | 1,375 | 1,280 | - | 1,500 | 750 | 2,000 | 1,250 | 1,250 | 3,250 | **19,435** |
| **Ending Cash on Hand** | (28) | 1,382 | 1,221 | 1,685 | 1,847 | 2,153 | 647 | 490 | 107 | 108 | 132 | 232 | 266 | **361** |

Filed 04/24/26
DRAFT

Case 26-10978
HRONIS, INC. / HRONIS FARMING
DIP BUDGET

Doc 254
PRELIMINARY / SUBJECT TO CHANGE

*($ in 000s)*

| | Week #<br>Week Ended | 1<br>3/15 | 2<br>3/22 | 3<br>3/29 | 4<br>4/5 | 5<br>4/12 | 6<br>4/19 | 7<br>4/26 | 8<br>5/3 | 9<br>5/10 | 10<br>5/17 | 11<br>5/24 | 12<br>5/31 | 13<br>6/7 | Post-Petition<br>Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DISBURSEMENTS BREAKOUT** | | | | | | | | | | | | | | | |
| **Land/Facilities** | | | | | | | | | | | | | | | |
| Indirect Opex | | - | - | - | 1 | 2 | 44 | 50 | 66 | 66 | 66 | 66 | 66 | 113 | 541 |
| Water Assessments | | - | - | - | - | - | - | - | - | - | - | - | - | 328 | 328 |
| Property Taxes | | - | - | - | - | - | - | - | 25 | - | 39 | - | - | - | 64 |
| **Total Land/Facilities** | | **-** | **-** | **-** | **1** | **2** | **44** | **50** | **91** | **66** | **105** | **66** | **66** | **441** | **933** |
| **2026 Crop Cost** | | | | | | | | | | | | | | | |
| Crown Suckering | | - | - | 68 | 203 | 43 | - | - | - | - | - | - | - | - | 314 |
| Equipment Rentals | | - | - | 1 | 17 | 8 | 18 | 30 | 60 | 60 | - | 60 | - | 102 | 356 |
| Fertilizers | | - | - | 46 | 121 | - | 31 | 155 | 150 | - | 383 | - | 158 | - | 1,043 |
| Fungicides/Insecticides | | - | 114 | 84 | 242 | 443 | 182 | 150 | 97 | 197 | 77 | 137 | 197 | 324 | 2,243 |
| Girdling | | - | - | - | - | - | - | - | 42 | 60 | 40 | 60 | - | 102 | 303 |
| Herbicides | | - | 18 | 17 | 12 | - | 8 | 59 | 7 | 15 | 7 | 10 | 11 | 19 | 185 |
| Spraying (included in "ongoing) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Tipping | | - | - | - | - | - | - | - | 143 | 143 | 143 | 243 | 113 | 192 | 978 |
| Tucking Cane+B53 | | - | - | - | - | - | 115 | 190 | 61 | 61 | 61 | 31 | 61 | 155 | 734 |
| Tying Vines (completed) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Vineyard Repair | | - | 18 | 1 | - | - | - | 24 | - | - | - | - | - | - | 44 |
| Repairs & Maintenance | | - | - | 14 | 125 | 14 | 21 | 10 | 3 | 3 | 3 | 3 | 3 | 7 | 204 |
| All Other Inputs | | (69) | 19 | 49 | 24 | 45 | 133 | 102 | 25 | 26 | 20 | 40 | 41 | 205 | 658 |
| **Total 2026 Crop Cost** | | **(69)** | **169** | **279** | **744** | **552** | **508** | **721** | **588** | **564** | **733** | **583** | **583** | **1,107** | **7,062** |
| **Rx Professional Fee Escrow** | | | | | | | | | | | | | | | |
| Debtor Counsel - Saul Ewing | | - | - | 300 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 250 | 1,675 |
| Debtor CRO/FA - Paladin | | - | - | 246 | 114 | 114 | 114 | 85 | 85 | 85 | 85 | 85 | 85 | 170 | 1,269 |
| UCC | | - | - | - | - | - | - | - | 100 | - | - | 100 | - | 125 | 325 |
| **Total Rx Professional Fee Escrow** | | **-** | **-** | **546** | **239** | **239** | **239** | **210** | **310** | **210** | **210** | **310** | **210** | **545** | **3,269** |